In the Interest of K.C., A Child.

No. 05–06–00013–CV.

Court of Appeals of Texas,
Dallas.

April 19, 2007.

Dean M. Swanda, Swanda & Swanda, P.C., Arlington, for Appellant.

Richard A. Sacks, Law Office of Richard Sacks, Tom Cain, Law Office of Tom Cain, Amy Sue Melo Murphy, Michael D. Munden, Dallas, for Appellee.

Before Justices WRIGHT, O'NEILL, and LANG–MIERS.

## OPINION

Opinion by Justice O'NEILL.

Texas Department of Family and Protective Services, Child Protective Services Division, Dallas County Unit (CPS) sought to terminate the parental rights of Mother to her son, K.C., under TEX.FAM.CODE § 161.001. Mother appeals a judgment on the jury's verdict to terminate. In two issues, she argues (i) the evidence is factually insufficient to support the jury's finding that termination was in K.C.'s "best interest" and (ii) her appeal is not procedurally barred by TEX.FAM.CODE § 263.405, as CPS and K.C.'s guardian contend. We assume without deciding her appeal is not procedurally barred, but find the evidence factually sufficient, and thus affirm.

## BACKGROUND

K.C. is eight. Mother is twenty-six and bore him at seventeen. She dropped out of school in the tenth grade at sixteen because of the pregnancy. K.C.'s father's whereabouts are unknown.[1] She also has a terminally ill six-year-old daughter by a different father; both voluntarily relinquished parental rights to the daughter.

At that time, when K.C. was four, the court appointed his maternal grandmother managing conservator and Mother possessory conservator, finding custody by her would "significantly impair" his "physical health or emotional development...." When the grandmother died two years later, the court appointed CPS temporary managing conservator, finding Mother's possession would endanger his "health and/or safety," and due to an "emergency situation and danger," CPS could not undertake "reasonable efforts" to avoid removal, taking custody, and placing him in foster care.

Six weeks later, Mother began serving a six-month jail term. CPS later brought this suit alleging "materially and substantially" changed circumstances. CPS alleged Mother (i) knowingly placed K.C. or knowingly allowed him to remain in conditions or surroundings endangering his physical or emotional well-being or (ii) engaged in conduct or knowingly placed K.C. with persons who engaged in conduct endangering his physical or emotional well-

1. K.C.'s alleged biological father was cited by publication but failed to appear. The court appointed an attorney ad litem for him, took evidence and made findings, and terminated his parental rights along with Mother's. He is not a party to this appeal.

being, *see* Tex.Fam.Code § 161.001(1)(D), (E), and (iii) termination was in his "best interest," *see id.,* § 161.001(2).

The jury unanimously found evidence of each of CPS' alleged termination grounds to be "clear and convincing" and returned a verdict of termination, on which the trial court rendered judgment, making affirmative findings on the termination grounds. It appointed CPS as K.C.'s permanent managing conservator, finding it to be in his "best interest." *See* Tex.Fam.Code Ann. § 161.206(a) and § 161.207(a) (Vernon 2002 and Supp.2006). This appeal followed.

### Terminating Parental Rights

Tex.Fam.Code Ann. § 161.001(1)-(2) (Vernon Supp.2006) terminations require proof and findings on two elements. First, a parent must have committed at least one of the acts or omissions listed under § 161.001(1). Second, under § 161.001(2), termination must be in the child's "best interest." *In re J.L.,* 163 S.W.3d 79, 84 (Tex.2005); *In re S.P.,* 168 S.W.3d 197, 202–03 (Tex.App.-Dallas 2005, no pet.). CPS alleged, and the jury found, under § 161.001(1)(D),(E), that Mother endangered K.C. She does not challenge this finding and argues only that the evidence is factually insufficient to support the jury's finding that termination was in K.C.'s "best interest."

### Best Interest

■■■ A "best interest" finding does not require evidence on any certain set of factors, nor does it limit the factors a fact finder may consider. *Wilson v. State,* 116 S.W.3d 923, 929 (Tex.App.-Dallas 2003, no

2. Mother waived any privileges and confidentiality knowing the evaluation would be used

pet.). These factors are non-exclusive, and evidence on all is not required:

- the child's desires;
- the child's present and future emotional and physical needs;
- present and future emotional and physical danger to the child;
- parenting abilities of one seeking custody;
- available assistance programs to promote the child's best interest;
- plans for the child by one seeking custody;
- stability of the home or proposed placement;
- acts or omissions of a parent indicating the parent-child relationship is improper;
- any excuse for the parent's acts or omissions.

*Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976) and *In re C.H.,* 89 S.W.3d 17, 27 (Tex.2002); *In re S.L.,* 188 S.W.3d 388, 393 (Tex.App.-Dallas 2006, no pet.). The jury can give "great weight" to the "significant factor" of drug-related conduct. *Dupree v. Texas Dep't of Protective and Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex. App.-Dallas 1995, no writ).

### Review of Evidence under "Best Interest" Factors

Many professionals testified on parental suitability and K.C.'s needs and prospects:

- Mother's psychologist Dr. Susan Talmage, who issued a report;[2]
- K.C.'s psychiatrist Dr. Samir Wahby, who works with child placing agencies;
- K.C.'s psychologist Dr. James Blue;

at trial.

- K.C.'s therapist, licensed professional counselor Angela Batson, who also works with child placing agencies;
- K.C.'s CPS caseworker Patricia Barry;
- K.C.'s CPS supervisor Mia Sonnier, who monitored and administered his case;
- K.C.'s "court-appointed special advocate" (CASA)[3] Rebecca Tendoeschate.

We review all the evidence under the governing standard and apply the best interest factors, ordering and grouping them for analytical convenience under the facts:

### Parental conduct, parental excuses, danger to K.C.

 Evidence supporting the jury's Tex.Fam.Code § 161.001(1)(D),(E) endangerment finding, which Mother does not challenge, can be probative of the Tex.Fam. Code § 161.001(2) "best interest" finding. *In re C.H.*, 89 S.W.3d 17, 28 (Tex.2002).[4]

Mother did not controvert a criminal record and incarceration for drug possession and theft, and a six-month jail sentence ending six months before trial. Though she claimed two possession charges involved lawful prescriptions, she admitted to a "drug problem" and "heavy" methamphetamine use beginning two to three years before trial, which continued until she was jailed to serve the six month sentence that was partly related to drug use or possession. She admitted testing positive for methamphetamine when CPS

removed K.C. Eugene, the father of Mother's daughter, believed she once used intravenous drugs daily. He said he found her in drug environments and around drug users and dealers in bad areas, most recently two or three weeks before trial, believed she has lived in "drug houses," and testified she took K.C. to "houses where they are using drugs" when he was four or five. He said K.C. knew drug dealers by name, which Mother did not deny, only saying the source was not the RV park where K.C. lived.

Mother denied taking K.C. to drug houses or exposing him to drug usage. But she admitted he "may have been with me while I was high...." Eugene's mother testified Mother had been "on drugs" with K.C. in her possession, and believed she was "high on drugs" when she caused her infant daughter's head to hit a table. The infant was taken to the hospital by ambulance, was diagnosed with a skull fracture, and is terminally ill, though there was testimony she suffered disabilities before the incident. No charges were filed, and Mother later voluntarily relinquished her parental rights. Mother's psychologist opined on a "pattern of self-destructive behavior" and deteriorating relationships from drug use, which K.C.'s CPS caseworker opined endangered him.

Mother blamed drug use on her mother's death, losing custody of her children,

---

3. CASA is an independent, non-profit organization that monitors and assists with adoptive placements. It interviews, observes, and liaisons with involved parties and reports its findings and recommendations to the court. It participates in court review hearings, acts as a court advocate for prospective adoptees like K.C., and oversees CPS to ensure CPS acts in a prospective adoptee's best interest.

4. "Endanger" means to "expose to loss or injury; to jeopardize"; though it requires more than a "threat of metaphysical injury"

or "possible ill effects of a less-than-ideal family environment," it is "not necessary that the conduct be directed at the child or that the child actually suffers injury." *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987); *In re S.P.*, 168 S.W.3d 197, 203 (Tex.App.-Dallas 2005, no pet.). Incarceration resulting from or coupled with an endangering course of conduct can justify termination. *Dupree v. Texas Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.-Dallas 1995, no writ).

and self-medication for a bipolar disorder she cannot afford to treat without employer health insurance. She said she got help for drug use the year before trial and participated in court-ordered services. She said she wanted to change for K.C., saw progress, and wanted the court to allow her to be a mother to K.C. if she stayed "clean" and off drugs. She admitted repeated missed parental visits when jailed, saw how it impacted her parenting, and said her goal was to serve her jail time to earn freedom to be a mother to K.C.

But there was evidence the jury could have relied on to discredit this. Mother's psychologist reported possible denial of a drug problem and resistance to change, and saw significant challenges to therapy's effectiveness due to relationship problems. The psychologist reported she had *not* participated in drug treatment or recovery groups, saying this was important and would show a realistic attempt at recovery. She would not admit drug use to K.C.'s CPS caseworker when asked about it, and at trial she denied discarding court-ordered drug assessment paperwork given to her by CPS and did not recall drug convictions until shown court papers. Eugene did not believe she could change, said his financial support to "get her away from the drug culture" was unavailing, and Eugene's mother believed she could not stop using drugs. Though she said she passed a drug test CPS requested, she failed to report for a court-ordered drug assessment CPS arranged and paid for, despite two opportunities. She was ordered to therapy before trial and said she agreed to try it to see if it would help, but at trial she discounted its importance. She denied seeing incarceration as a "pattern" or a result of her conduct, but she was again jailed the weekend before and week of trial, for shoplifting. She claimed it was inadvertent, but she reported four shoplifting arrests.

### Mother's plans, home stability, parenting ability

Mother took parenting classes and cited counseling skills she said helped K.C.'s behavior, offered financial support, said she loved K.C., wanted to "be a mother" to him, and would abide by all court orders. But she does not want managing conservatorship. She said she did not have a safe or suitable home for K.C. and did not want her "son to be returned home to me." She wanted only to retain parental and visitation rights and have the court appoint as managing conservator her deceased mother's former paramour (a family friend with a history of caring for K.C.) or alternatively Eugene, her daughter's (but not K.C.'s) father. The friend believed she should not have unsupervised visits; Eugene opined Mother's custody would not be in K.C.'s best interest and would endanger him.

Mother has no history of stable employment and she only testified to two short-term jobs. Eugene said she often depended on others for money, and "her attitude" kept her from finding or keeping jobs. Her psychologist diagnosed her with several personality, behavioral, and relationship disorders, and though considering favorable factors, her ultimate prognosis was "Poor." There was testimony about volatile outbursts and cursing in front of K.C., and inconsistent vacillation from love to anger at parental visits that upset and confused him. The testifying professionals uniformly opined termination was in K.C.'s best interest, in order to find a stable, supportive adoptive home.

### K.C.'s desires

This factor did not significantly mitigate against termination. There was testimony K.C. loved Mother and enjoyed or was excited about visits; she said they were close and termination would "devastate" him; his psychologist reported a strong

wish to see her; his psychiatrist testified he was angry about being placed in foster care and missed her; and there was testimony about fights with another child in foster care resulting in bites and bruises. But his psychologist reported he liked his foster home, reported progress there, bonding, and improved behavior, and could not recall him expressing "any specific memories" about Mother. His therapist and CPS caseworker said he never revealed a significant adult figure in his life or any particular relative with whom he preferred to live or be around. When discussing Mother, his therapist said he did not engage in the conversation or express any feelings, merely mentioning a visit:

> When he talks about his mom, he doesn't express any feelings about her. It's more just a general "we have a visit coming up" or "I saw her last week." But there is nothing more than that.

### K.C.'s needs

Testifying professionals uniformly opined K.C. is special needs. Professionals identified a large number of serious behavioral problems. His psychiatrist diagnosed attention deficit, hyperactive, and mood disorders, and his psychologist suggested possible "attachment disorder," defined as an early "broken bond," usually with the mother and caused by neglect.

### State's plans, available assistance, proposed placement stability

K.C.'s psychiatrist opined K.C.'s disorders are not short term. He prescribed medication and counseling. K.C. receives weekly therapy with a licensed professional counselor and sees his psychiatrist

monthly for medication management. His therapist opined he would benefit from counseling indefinitely. His psychologist's report makes thirty-two detailed recommendations for his care givers. Testifying professionals uniformly opined K.C.'s special needs require a stable, supportive home and care givers with time, patience, and commitment to address his issues, continue his care, and provide consistent boundaries, supervision, and discipline.

Though there was testimony that behavior problems, scholastic setbacks and decreased school performance coincided with foster placement, no professional opined that the placement was specifically the cause.[5] And K.C.'s therapist testified his behavior "deteriorated," he "started having more issues," and his misbehavior became "more frequent and more intense" with Mother's parental visits. There was testimony that any placement is stressful and that his behavior fluctuates, but the testifying professionals saw marked progress, opined that his current foster care can meet his needs until an adoptive home is found, and that he could become adoptable under continued care. CPS has successfully placed similarly situated children and opined it was reasonable to expect it could do so here. K.C.'s psychologist opined that in a proper placement, his problems will "start fading away."

EVIDENTIARY BURDEN AND
STANDARD OF REVIEW

Required findings must be based on "clear and convincing" evidence, TEX. FAM.CODE ANN. § 101.007; § 161.001; § 161.206(a) (Vernon 2002 and Supp.2006); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.

---

5. Mother's two proposed candidates for managing conservator said they believed K.C. did not have issues before and only started acting up after his foster placement. But they did not say why they thought the foster placement

was the cause if that was their belief, and the jury was free to decide how significantly to credit testimony from interested witnesses potentially seeking custody.

2002); *In re S.P.*, 168 S.W.3d 197, 202 (Tex.App.-Dallas 2005, no pet.). Mother argues only factual, not legal, insufficiency. There, we look at all evidence in support and contrary to a finding, give "due consideration" to evidence a fact finder could reasonably find clear and convincing, and ask if it is such that the fact finder could reasonably form a firm belief or conviction that the State's allegations are true. Where evidence is disputed, we first ask if a reasonable fact finder could *not* have resolved or credited it in favor of a finding. If not, we ask if that evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction that the State's allegations are true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002) (*applying In re C.H.*, 89 S.W.3d 17, 18–19, 25 (Tex.2002)); *In re S.L.*, 188 S.W.3d 388, 392 (Tex.App.-Dallas 2006, no pet.).

▮▮▮▮ Considering all relevant factors under the applicable standard, we conclude the evidence is factually sufficient. Though there were evidentiary conflicts, we "must give due deference to a jury's factfindings ... and should not supplant the jury's judgment with [our] own...." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We may not balance competing evidence to substitute our judgment for the jury's. *Id.* at 109. Moreover, on key issues the only source of conflict was Mother's own testimony, which the jury was entitled to discredit, and which we in turn are not authorized to second-guess. Evaluating witness credibility is the sole province of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003); *In re S.L.*, 188 S.W.3d 388, 394 (Tex.App.-Dallas 2006, no pet.).

### MOTHER'S ARGUMENTS

▮▮▮▮ Mother argues the evidence is factually insufficient to terminate because "undisputed evidence" shows K.C. "needed to continue seeing" her. But that evidence does not aid her case because it is simply testimony by K.C.'s therapist, CPS supervisor and caseworker that continued visits may benefit him in transitioning into a permanent adoptive placement.

Mother does not correctly address the best interest criteria. She does not seek managing conservatorship, only visitation. She has no concrete plan of her own; her plans are whatever either of the two alternate managing conservators she proposed planned. *Cf. In re C.H.*, 89 S.W.3d 17, 28 (Tex.2002) (noting "no concrete plan to provide emotional or physical care"). There was evidence she was not equipped to parent K.C., or provide a suitable home. She conceded the latter and stated she did not want her "son to be returned home to me." Her apparent plan is to maintain the status quo until, as stated in her brief, "some unknown future time" when the court can find her suitable.

▮▮▮▮ That ignores what we recognize as the "paramount consideration" in assessing a child's present and future physical and emotional needs in a "best interest" inquiry: "the need for permanence...." *Dupree v. Texas Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex.App.-Dallas 1995, no writ); *accord, In re S.L.*, 188 S.W.3d 388, 392–94 (Tex.App.-Dallas 2006, no pet.) (upholding termination for mother not seeking managing conservatorship). The State's interest in establishing a "stable, permanent home" is "compelling," and a parental-rights termination, when grounds authorizing it are met, serves that goal by permitting adoption. *See In re S.H.A.*, 728 S.W.2d 73, 92 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

▮▮▮▮ Mother argues the jury charge's structure led the jurors to ignore the best interest test. Mother did not request

managing conservatorship and proposed two managing conservator candidates (unrelated to K.C.). The charge instructed the jurors to select one (and to decide whether to allow Mother visitation) only if they answered "no" to the first threshold question to terminate, which incorporated the best interest standard. The charge had no third candidate and left to the court to decide whom to appoint managing conservator if they terminated. Mother concludes the real reason they terminated was because they found neither of her candidates suitable.[6] And she argues they could not properly have considered K.C.'s best interest unless they had an option to choose not to terminate, leave K.C. in foster care indefinitely, and permit continued visitation with Mother and her managing conservator candidates, contending he needs this "extended family unit."

First, Mother concedes she did not object to the charge, so any error is waived. *In re B.L.D.*, 113 S.W.3d 340, 352, 354–55 (Tex.2003) (appellate courts "must not retreat from our error-preservation standards to review unpreserved charge error in parental rights termination cases," though constitutional due process rights are involved); *In re J.W.*, 113 S.W.3d 605, 613 (Tex.App.-Dallas 2003, pet. denied) (failing to object waives charge error under TEX.R.APP.P. 33.1(a)).

Second, even if preserved, Mother cannot show harmful error. The jury had before it testimony on the type and extent of support the proposed managing conservators would afford, and her suitability as possessory conservator with visitation rights. It was instructed to terminate only if "absolutely necessary," and only if it was "impossible" through "any less restrictive means" to serve K.C.'s best inter-

est. It was instructed that if it did not terminate the court could still enter an order modifying parental rights to K.C., or "render any Order that is in the best interest of the child." It ultimately decided to terminate and was instructed to apply the best interest test in deciding.

■ Thus, Mother's argument is really just speculation the jury did not follow its instructions. But we must presume they did "unless the record demonstrates otherwise," and Mother offers no evidence. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 771, n. 61 (Tex.2003) (listing cases); *Harris County v. Smith,* 96 S.W.3d 230, 237 (Tex.2002) ("We have long held that '[a]n appellate court must assume that a jury properly followed the trial court's instructions.' ").

STATEMENT OF APPELLATE ISSUES

CPS and K.C.'s guardian and attorney ad litem argue Mother's appeal is barred because her statement of appellate points did not comply with TEX.FAM.CODE ANN. § 263.405(b) and (i) (Vernon Supp.2006), which require an appellant to timely file a specific statement to preserve issues for review, and provide that a global factual insufficiency point is not sufficiently specific. Mother's second issue argues (i) she complied with the statute; (ii) any noncompliance should be excused under TEX. R.APP.P. 2; and (iii) § 263.405 unconstitutionally violates legislative and judicial "separation of powers." Mother also argues "involuntary termination statutes are strictly scrutinized in favor of the parent." *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). In light of our disposition of the merits, we do not reach these arguments

---

**6.** CPS found both managing conservator candidates unsuitable, and there was uncontroverted evidence on many of its reasons. We do not review that evidence because the jury did not reach the managing conservator selection question under the charge's instructions.

and assume, without deciding, that she complied.

### ATTORNEY AD LITEM FEES

 K.C.'s guardian and attorney ad litem requests reasonable attorney ad litem fees but cites no authority authorizing it, does not point to where in the record he adduced evidence on reasonable fees or otherwise preserved the issue in the trial court, and did not file a cross notice of appeal. The fee request is waived. *See Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex.1992) (fees generally unrecoverable absent contract or statute authorizing them) and *Blanks v. Liberty Mut. Fire Ins. Co.*, 196 S.W.3d 451, 452 (Tex.App.-Dallas 2006, pet. denied) (inadequate briefing waives complaint); *Air Park–Dallas Zoning Committee v. Crow Billingsley Airpark, Ltd.*, 109 S.W.3d 900, 912 (Tex.App.-Dallas 2003, no pet.) (failing to complain of judgment silent on fees by motion to amend or correct or for new trial and failing to request findings and conclusions waives error); TEX. R.APP.P. 33.1(a) (appellate complaints not preserved without first presenting them to the trial court and obtaining a ruling or objecting to failure to rule) and TEX. R.APP.P. 25.1(c) (parties seeking relief more favorable than trial court's judgment provides must file notice of appeal).

### CONCLUSION

Because we hold the evidence factually sufficient, we overrule Mother's first issue, and affirm the trial court's judgment terminating Mother's parental rights to K.C. We do not reach Mother's second issue in light of our disposition of her first. We deny the attorney ad litem's request for fees.