

NUMBER 13-18-00464-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF G.N., N.G., A.G., AND C.S., CHILDREN

On appeal from the County Court at Law
of Aransas County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Benavides
Memorandum Opinion by Justice Contreras**

Appellant J.R. contests the trial court's judgment terminating her parental rights as to her biological children, G.N., N.G., A.G., and C.S.[1]  J.R. contends by three issues that: (1) the order of termination "failed to state specific grounds"; (2) the evidence was legally and factually insufficient to support the trial court's best interest finding; and (3) she was denied effective assistance of trial counsel.  We affirm.

---

[1] We refer to the children and their parents by their initials in accordance with the rules of appellate procedure.  *See* TEX. R. APP. P. 9.8(b)(2).

# I. BACKGROUND

On July 27, 2017, the Department of Family and Protective Services (the Department) filed a petition seeking termination of J.R.'s parental rights to the four children at issue. The Department also sought termination of the parental rights of R.N. (the father of G.N.), J.G. (the father of N.G. and A.G.), and L.S. (the father of C.S.).[2] At the time of the bench trial on August 21, 2018, G.N., N.G., A.G., and C.S. were nine, five, four, and two years of age, respectively.

Trial testimony established that J.R. has an extensive history with the Department, beginning in 2010, when the Department received a report that J.R.'s boyfriend had shoved her while she was holding G.N. In May of 2011, J.R. prematurely gave birth to a son, but the child died in August from SIDS-related causes. In October of 2011 there was a finding of neglectful supervision regarding G.N., and J.R. tested positive for methamphetamine. In January of 2016, when police came to J.R.'s residence to check on L.S., who was on parole at the time, they found the children alone. As a result, the Department made another finding of neglectful supervision; J.R. was charged with the felony offense of abandoning or endangering A.G.; and the children were removed from J.R.'s custody. The children were then returned to her custody in July of 2016 in accordance with the guardian ad litem's recommendation, but against the Department's recommendation. The case was then dismissed.

One year later, in July of 2017, the Department received reports that J.R. was engaging in drug use in the home and that she had "sold" a child who was born the month before. Upon investigation, the Department found no signs of drugs or alcohol at J.R.'s

---

[2] The fathers of the children, whose parental rights were also terminated by the trial court's judgment, are not parties to this appeal.

2

home. Nevertheless, J.R. tested positive for methamphetamine and the children were removed again, leading to these termination proceedings.

## A. J.R.'s Trial Testimony

J.R. testified that she pleaded guilty to felony abandonment or endangerment on October 10, 2016 and was placed on deferred-adjudication community supervision. She asserted that she is in compliance with the community supervision conditions and no motion to revoke has been filed.

According to J.R., she has been employed by Five Star Restoration since January 25, 2018 and earns $1,400 to $1,600 per month; however, she did not have any supporting documentation. She stated that she currently lives in a two-bedroom apartment in Ingleside, but plans to move to Dallas where she would have a "permanent job" with the same employer.[3] J.R. later testified that she plans on staying in the Ingleside apartment "[l]ong-term." She identified several photographs of the apartment, depicting the children's beds and other rooms.

J.R. acknowledged that she had been "lying" when she testified at a hearing on January 30 that she was working at Sonic at that time, and she agreed that the trial court awarded her extra visitation based on that incorrect testimony. She testified that she actually stopped working at Sonic sometime between January 25 and 30. J.R. further conceded that she lied when she told her counselor that she last used methamphetamine in 2016; in fact, she last used it in 2017. She agreed that she missed two to four visits with the children in 2018 because the visits were in Corpus Christi, whereas she was "working" and "moving" from Rockport to Ingleside.

---

[3] J.R.'s employer testified that J.R. is a "very, very hard worker" and is "very dedicated," and she confirmed that she had offered J.R. a job in Dallas doing the same type of work. The employer stated she did not have documentary proof of J.R.'s employment or pay because her employees are paid in cash.

3

J.R. gave birth to another child, a daughter, in June of 2018. She testified that she had committed to put the baby up for adoption, and the adoption agency had paid her rent for the first several months of 2018, but she did not go through with the adoption. She acknowledged that her testimony at the January 30 hearing that she was saving money for rent was incorrect. J.R. conceded that the child's father, J.G., did not want the child to be adopted but that he is incarcerated. She also agreed that she had told G.N. about the pregnancy before she advised the Department, and though G.N. wanted her to keep the baby, she told G.N. that having another child in the household would "cost a lot of money" and "take time away."

Upon questioning by the children's attorney ad litem, J.R. agreed that, though her son N.G. needed outpatient surgery at one point to place tubes in his ears, she opposed the surgery "because [she] couldn't have [her] way and have him home with [her]." She acknowledged that, "[w]hen you put it like that, yes, ma'am, it does sound selfish." She further conceded that, though she has been diagnosed with anxiety disorder, bipolar disorder, insomnia, and depression, she has decided not to take medication as her counselor recommended.

When asked by the guardian ad litem whether the children "think they're coming home," J.R. testified:

> [G.N.] is oldest, she knows I'm going to court today. [The Department caseworker] told her about termination, which I didn't approve of. My other ones cry, they want to come home. All I can say is I need a little more time, they'll be home soon.

She later stated:

> I did wrong. I will take full responsibility for that. Yes, am I tired of C.P.S. getting involved? Yes, I am. A lot of the allegations—people don't like me, okay? I've learned my lesson. I don't hang out with anybody, regardless of allegations called on. I don't like dealing with them just as much as they don't like dealing with me. And I see the effect it has on my kids.

4

Yes, it may have taken me a while to get it and grow up or whatever. I'm going to be 30 years old, but at least I got it, at least I got it. At least I didn't stop and just give up and fall off the track and go somewhere else and abandon my kids like that.

They need to stay together, and they need to be with me and their sister. I think that that's what's best, and I'm not saying it just because I want my kids home. As a parent, when you mess up you can't turn back and you cannot—you can't erase what you've done, you can't. All I can do is make it better like I've done. I've continued the progress that I've done. I've stayed on it, and continue to do it.

And I'm done with C.P.S. I don't ever want to see them again. I want my kids home. I want to raise them, raise them right.

Am I going to struggle with five kids, because it comes up a lot? Yes. What parent doesn't struggle by themselves with five kids? Doesn't mean I'm going to stop or give up. My kids are spoiled. They're going—I'm going to continue to keep providing for my kids.

On examination by her attorney, J.R. testified that she has complied with the Department's service plan, including completing substance abuse and mental health counseling, attending Alcoholics Anonymous classes, sustaining her employment, and refraining from drug use. She also testified that, on the previous occasion when the children were removed from her, they had been injured while in the custody of the Department, resulting in the court returning the children to her. Additionally, she stated that A.G. and C.S. had been injured while in their current foster care placements—specifically, A.G. "had apparently fallen on a toy and gotten his tooth pushed all the way back," and C.S. "had bite marks"—though neither child indicated to her that the foster parents hurt them.

She denied that she "sold" her son born in 2017 "on the black market"; instead, she had offered him for adoption through a legitimate, State-licensed adoption agency. She stated she was "homeless" with her children "[f]or six to nine months" and that she decided to put her son up for adoption "to provide for my other four children" as a "sacrifice

5

out of love." As to her daughter born in 2018, J.R. acknowledged that the adoption agency is "upset" with her because, though it paid for her rent for several months, she eventually decided not to put that child up for adoption because a "bond [had] already formed" between her and the child.[4] When asked why she thought she was the subject of termination proceedings, J.R. stated: "[I]t was my action, was my choice. I smoked meth. Even though it was one time, doesn't matter how many times it was, I smoked and I got caught, and that's what it was for."

## B. Caseworker's Testimony

The Department caseworker assigned to the case, Jena Edgehill, testified that the children are doing "very well" and are "happy and healthy" in their current foster care placements, and they do not have any ongoing specialized medical needs. She stated that the children's current foster homes are "some of the better foster homes [she has] seen" in her ten years as a caseworker, and that "the growth that has been seen with these kids over the last year in their current placements is easily recognizable by anybody that knows and cares about these children."[5] A.G. and C.S. call their foster parents "Mom" and "Dad." Both sets of foster parents have committed to allowing the siblings to have contact with each other. G.N. has stated both that she wants to go home and that she wants to stay with her foster family.

According to Edgehill, J.R. does not present a threat of physical harm to the children. However, G.N. "has been put in positions where she has had to lie on behalf of

---

[4] J.R. explained that, once the child was born, hospital staff "didn't take her immediately away from me, they put her on my chest." J.R. believed that this was contrary to the contract she signed with the adoption agency. An Ingleside police officer testified that, based upon a complaint police received the day before trial, J.R. is under investigation for fraud related to her dealings with the adoption agency.

[5] As to the allegations that the children were injured in the custody of the foster parents, Edgehill testified that she was not aware of any details.

6

her mother, and she is concerned about watching what she says at the visits," which causes G.N. "a substantial amount of stress." Further, J.R. has "continuously during phone visits and in-person visits promised these children that they are coming home," even though that outcome was not certain. And at one point, J.R. told G.N. over the phone that G.N. did not have a father and that "God is your dad."

Edgehill testified that it is in the best interest of the children to remain where they are currently placed because:

> [J.R.] has had C.P.S. intervention since 2010 and has done C.P.S. services many times over and yet seems to find herself in the same positions and puts these children through the same situations over and over again.

> [J.R.] does not and has not demonstrated any kind of significant change throughout the last eight years since C.P.S. first intervened.

> The Department is of the opinion that if the children were to be returned to [J.R.] that they would be at significant risk of reentry into the foster care system, which is something they are scared of.

> . . . .

> [J.R.] has not demonstrated that while the children lived with her that she could provide stable housing for them, that she could have maintained employment, that she could meet her own needs or meet any of the children's.

> Over the last year it has become clear that the children's best interest is them—for them to remain in the current placements where they are, because their needs are being met where previously they were not.

Edgehill stated that, based on J.R.'s testimony regarding her income and expenses, "it does not appear that [J.R.] truly has the finances to be able to support the current bills that she has." In particular, she stated the Department is concerned that

> if [J.R.] is not able to pay the daycare bill then she would not be able to work. In the previous C.P.S. case that's about what happened. [J.R.] didn't follow through with daycare like she said that she would, she quit the job that she had, she no longer could afford the housing that she had, and she and the children ended up homeless.

7

According to Edgehill, J.R. "complete[d] the tasks" in the service plan but "has not demonstrated that she has gained any knowledge" or "changed her behavior." In particular, she noted that, although J.R. claimed to have a stable home for the children in Ingleside, she told G.N. that they would be moving to Rockport. Edgehill also stated that one visit she observed was "chaotic," with J.R. "tr[ying] to parent and take care of the other children" while G.N. cared for C.S., who was "trying to eat paint." C.S. had lice that were "burrowed so deeply into her head that there is scarring." Further, because J.R. did not enroll G.N. in school, the child had to repeat the second grade.[6]

Edgehill stated that the Department was recommending termination because: (1) J.R. used methamphetamine while she was the primary caretaker of the children; (2) according to G.N.'s therapist, the child had been the witness of domestic violence; (3) J.R. "did not complete the child support task" that was part of the service plan; (4) J.R. has not demonstrated she could provide a stable environment for the children "when she was not paying for it"; and (5) J.R. "has not demonstrated . . . change" as a result of her counseling. Edgehill conceded that J.R. has not tested positive for drugs since July of 2017.

## C. Other Witnesses

A former co-worker of J.R. testified that she (the co-worker) had lied at a previous hearing about the date J.R. was hired and about J.R. being employed at Five Star Restoration "long-term." The co-worker stated that J.R. in fact worked there from March to May for $12 per hour and "it was not a steady job." She agreed with J.R.'s counsel that she (the co-worker) had "committed aggravated perjury," and she stated that she

---

[6] Edgehill also testified that, though J.R. was ordered to pay child support, she has not done so. J.R. denied that she was ordered by a court to pay child support.

"came forward" with the truth because she "didn't appreciate the things I found out in court, they made me feel sick in my stomach for lying."[7]

The therapist for G.N., A.G., and C.S. testified that G.N. was "very angry" about being placed in foster care, removed, and placed again. The therapist diagnosed G.N. with post-traumatic stress disorder (PTSD) due to witnessing domestic violence perpetrated by her father against J.R. in the presence of G.N. and C.S. She stated that A.G. also shows several "symptoms" of having witnessed domestic violence. Because of this history, the children require "not only good parental figures but extraordinary parental figures that are willing to learn what PTSD is, that are willing to help them deal with it so that they can recover."

A.G. and C.S.'s foster father testified that he and his wife intend to adopt the children. He stated that the children tend to be argumentative and have "nightmares" for a period after visiting with J.R. He stated that, during a period where they did not see their mother, their misbehavior and nightmares subsided; but "[o]nce the visits started getting more frequent it started happening more." Although A.G. was "kicked out of one daycare for being very aggressive" and C.S. was "kicked out of school for biting," the children are "doing awesome" in their current daycare. He stated it was in the children's best interest to remain with him "because they need a hundred percent attention."

G.N. and N.G.'s foster mother stated that, when she first took custody of N.G., "his speech was hardly understandable," but he has "shown a lot of improvement" after receiving speech services. She knew G.N. previously because she was her kindergarten teacher. She stated that both children are doing "very well" in her custody, though she

---

[7] J.R.'s employer testified that the co-worker was fired around "six or seven" months prior to trial for stealing a tablet computer from a job site.

9

agreed that G.N., as the oldest child, "may struggle more than the other children emotionally" in the event that J.R.'s parental rights were terminated. At one point, she had to terminate a phone call between J.R. and G.N. when J.R. began discussing the court case with regard to the other children. She stated that she and her husband "absolutely" intend to adopt the children.

## D. Oral Ruling and Judgment

Following trial, the trial court orally ruled as follows:

I find that by clear and convincing evidence [J.R.] has failed to establish a safe environment or sufficient or stable employment or support for the children, and by her own admission has a significant lack of ability to tell the truth, particularly in court under oath, and has also of course incurred the deferred adjudication for child abandonment involving the felony conduct.

Based on that evidence I find it is in the best interest of the children that the parent-child relationship between [J.R.] and [G.N.], [N.G.], [A.G.] and [C.S.] is terminated.

After J.R.'s counsel expressed his client's desire to appeal, the following colloquy occurred:

| [Department's counsel]: | Your Honor, do I understand your order is based—and it includes the alphabet letters D and E? |
|---|---|
| THE COURT: | I don't remember the categories by name. |
| [Department's counsel]: | The reason I ask that, Your Honor, is it impacts the other case[8] and how we proceed in the other case. |
| THE COURT: | Tell me what they are, and I'll tell you. |
| [Department's counsel]: | D was—D is—let me read it, I'm a little tired. |
| THE COURT: | That will be fine. |
| [Department's counsel]: | "Knowingly place or knowingly allow the child to |

---

[8] Counsel is referring to termination proceedings in a different county regarding J.R.'s child born in 2018.

10

| | remain in conditions or surroundings which endangers the physical or emotional well-being of the child; engaged in conduct knowingly—" |
|---|---|
| THE COURT: | Wait a minute, which letter is that? |
| [Department's counsel]: | D. |
| THE COURT: | D. |
| [Department's counsel]: | And I'll give you the book if I said it wrong. |
| | E, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." |
| THE COURT: | Those are the only two you're interested in? |
| [Department's counsel]: | Well, just for the other case. No, sir, I'm interested in all the other ones I listed. |
| THE COURT: | D and E are included. |

Subsequently, a written judgment was entered terminating J.R.'s parental rights and appointing the Department as the children's permanent managing conservator.[9] The judgment stated that the trial court found by clear and convincing evidence that J.R.: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West, Westlaw through 2017 1st C.S.); (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, *see id.* § 161.001(b)(1)(E); (3) failed to support the children in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition, *see id.* § 161.001(b)(1)(F); (4)

---

[9] As to each child, the judgment stated that "the appointment of [J.R.] as permanent managing conservator of the children is not in the children's best interest because the appointment would significantly impair [the] children's physical health or emotional development."

11

was convicted or placed on community supervision for being criminally responsible for the death or serious injury of a child under section 22.04 of the penal code, *see id.* § 161.001(b)(1)(L); and/or[10] (5) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, who were in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal for abuse or neglect, *see id.* § 161.001(b)(1)(O). The judgment also stated that the court found by clear and convincing evidence that termination of J.R.'s parental rights is in the children's best interest. *See id.* § 161.001(b)(2).

This appeal followed.

## II. DISCUSSION

### A.    Specificity of Judgment

By a multifarious first issue, J.R. contends in part that "[t]he trial court improperly entered the Order of Termination by failing to state specific grounds for termination."[11] She claims that "the specific grounds for termination were not clearly stated in the court's ruling" and "the reasons provided in the court's ruling do not sufficiently correlate to the grounds that were ultimately listed in the Order of Termination." J.R. appears to contend by this issue that the trial court's oral ruling, made at the conclusion of trial, improperly varied from the written judgment.

We disagree. Even if there was an inconsistency between the trial court's oral pronouncement at the hearing and its subsequent written order, the written judgment

---

[10] The judgment lists the five predicate factual findings without a grammatical conjunction such as "and" or "or."

[11] J.R. also contends within her first issue that the evidence was insufficient to support the trial court's predicate factual findings.

controls. *See In re A.S.G.*, 345 S.W.3d 443, 448 (Tex. App.—San Antonio 2011, no pet.) (explaining that the final written order in a suit affecting parent-child relationship that did not award attorney's fees controlled over the oral pronouncement awarding such fees); *In re K.M.B.*, 148 S.W.3d 618, 622 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding court's statement in written order reserving ruling on claim for attorney's fees controlled over court's oral pronouncement at end of hearing that no attorney's fees were awarded); *see also In re M.L.S.*, No. 11-12-00042-CV, 2012 WL 2371042, at *1 (Tex. App.—Eastland June 21, 2012, no pet.) (mem. op.). And the written judgment in this case—which contains affirmative findings under parts (D), (E), (F), (L), and (O) of family code subsection 161.001(b)(1)—complied with the rule of civil procedure requiring that a final judgment in a parental-rights termination case "state the specific grounds for termination." TEX. R. CIV. P. 306.

This part of J.R.'s first issue is overruled.

## B.    Sufficiency of the Evidence

J.R. argues by her second issue that there was insufficient evidence to support the trial court's finding that termination of her parental rights was in the children's best interest.

### 1.    Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.); *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly,

13

termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.).

In reviewing the legal sufficiency of evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005); *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

When reviewing the factual sufficiency of the evidence supporting termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89

S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code subsection 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2); *In re J.L.*, 163 S.W.3d at 84.

### 2. Analysis

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131 (West, Westlaw through 2017 1st C.S.); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Factors that we consider in determining whether termination of parental rights is in the child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all

15

nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27. Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in a child's best interest. *Id.* at 28.

As to the first factor, Edgehill and G.N.'s therapist both stated that G.N. has expressed conflicting desires about the outcome of the case. J.R. testified that the three youngest children "want to come home," but as young children, they cannot credibly express their desires. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (finding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires"). This factor weighs neither for nor against termination.

As to the second factor, the therapist for G.N., A.G., and C.S. testified that, because they had been witnesses to domestic violence and show symptoms of PTSD, these children require "extraordinary" parental care. There was no other evidence that the children have any specific medical or emotional needs beyond those typical for their respective ages. This factor weighs slightly in favor of termination.

Relevant to the third and eighth *Holley* factors—emotional and physical danger to the children, and acts or omissions which may indicate an improper parent-child relationship—is J.R.'s history of twice being cited for neglectful supervision of her children. Further, J.R. opposed surgery for N.G. "because [she] couldn't have [her] way and have him home with [her]," which she conceded "sounds selfish." J.R. tested positive for methamphetamine use in 2011 and again at the beginning of this case in 2017, though this is somewhat mitigated by the fact that she has not tested positive for drugs since the

16

children were removed in July of 2017. *See In re M.R.,* 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that a parent's drug use supports a finding that termination is in the best interest of the child); *see also In re N.L.D.*, 412 S.W.3d 810, 823 (Tex. App.—Texarkana 2013, no pet.) ("Evidence that a person has recently improved her life weighs against a finding that termination is in the best interest of the child."). There was evidence that C.S. had a severe lice infestation; that J.R. inappropriately told the children at visits that they would be reunited with her; and that J.R. has put G.N. in a position where she has to lie on J.R.'s behalf, risking emotional harm to the child. Additionally, A.G. and C.S. misbehave and have nightmares after visiting with J.R. And, J.R. failed to enroll G.N. in school, causing him to be held back in the second grade.

On the other hand, Edgehill testified that J.R. presents no risk of physical harm to the children—whereas the evidence established that the children had accidentally suffered minor injuries while in the custody of the Department. These factors weigh slightly in favor of termination.

The aforementioned evidence is also relevant to the fourth *Holley* factor, regarding parenting abilities of the parties seeking custody; and the sixth factor, regarding plans for the children by the parties seeking custody. Though it is undisputed that J.R. complied with the non-financial tasks required of her in the service plan, Edgehill testified that J.R. "has not demonstrated any kind of significant change" as a result of completing those tasks.

We observe, though, that the Department's concerns regarding J.R.'s parenting abilities and plans for the children appear to largely stem from her difficulty in finding and maintaining a job that would allow her to financially support her family. When asked why she believed termination was in the children's best interest, Edgehill emphasized that,

without termination, the children "would be at significant risk of reentry into the foster care system" because of J.R.'s demonstrated "inability" to provide stable housing or maintain employment. J.R. stated that she was "homeless" for a period of six to nine months ending in 2017. Further, though J.R. and her employer testified that J.R. is currently gainfully employed, they could not provide documentary evidence of that fact, and J.R.'s former co-worker testified that J.R. did not in fact have a "steady job."

A court may not order termination of the parent-child relationship based on evidence that the parent is "economically disadvantaged." TEX. FAM. CODE ANN. § 161.001(c)(2). The Department asserts that J.R.'s financial struggles are probative to the best interest inquiry because they reflect her "poor judgment," but it points to no examples of specific poor economic decisions she made which contributed to her predicament. Instead, it is apparent that, although J.R.'s ability to financially provide for her family is in doubt, that is due in large part to economic disadvantage. In light of this, our consideration of the fourth and sixth *Holley* factors weighs neither for nor against termination.

As to the fifth *Holley* factor, programs available to the parties seeking custody, it is undisputed that J.R. complied with the non-financial tasks required of her in the service plan. There was no other evidence adduced relevant to this factor. This factor weighs slightly against termination.

As to the ninth factor, excuses for the acts or omissions of the parent, J.R. testified that she missed several visits in 2018 because she was working and moving. She did not provide excuses for her methamphetamine use in 2017 but, rather, acknowledged that it was her "choice." Consideration of this factor weighs neither for nor against termination.

18

We finally address the seventh *Holley* factor, regarding the stability of the home or proposed placement. A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *see In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the children's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931; *see also J.R. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00108-CV, 2015 WL 4603943, at *6 (Tex. App.—Austin July 30, 2015, pet. denied) (mem. op.).

The evidence here established that the children are healthy and thriving in their current foster placements, though two of them have suffered minor accidental injuries there. The foster families intend to adopt the children and continue to allow the siblings to have contact with each other. A.G. and C.S. call their foster parents "Mom" and "Dad." J.R., on the other hand, testified that she was recently homeless, and she gave conflicting testimony about her future plans, stating both that she planned to move to Dallas and that she planned to stay "long-term" in Ingleside. Consideration of the seventh *Holley* factor weighs in favor of termination.

Overall, having considered the trial record in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have formed a firm belief or conviction, based on clear and convincing evidence, that termination of J.R.'s parental rights was in the children's best interest. *See In re J.L.*, 163 S.W.3d at 85. Further, the

19

evidence to the contrary was not so significant as to preclude such a finding. *See In re J.F.C.*, 96 S.W.3d at 266. In particular, the trial court could have reasonably concluded that, if termination were not ordered, the children would suffer because they would be removed from their current placements, in which they are thriving. *See In re K.C.*, 219 S.W.3d at 931.

Though the evidence was not overwhelming, we find that it was legally and factually sufficient to rebut the strong presumption that keeping the children with their biological mother is in their best interest. *See* TEX. FAM. CODE ANN. § 153.131. J.R.'s second issue is overruled.

## C. Ineffective Assistance of Counsel

In a suit filed by a governmental entity seeking termination of parental rights, indigent parents who respond in opposition to the termination are entitled to the appointment of counsel to represent their interests. TEX. FAM. CODE ANN. § 107.013(a)(1) (West, Westlaw through 2017 1st C.S.). This statutory right to the appointment of counsel necessarily embodies the right to effective assistance of counsel at every critical stage of the proceeding. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). To establish ineffective assistance, the movant must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the appellant. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). As to the first prong,

> counsel's performance falls below acceptable levels of performance when the representation is so grossly deficient as to render proceedings fundamentally unfair. In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. It is only when the conduct was so outrageous that no competent attorney would have engaged in it, that the challenged conduct will constitute ineffective assistance.

20

*Id.* at 545 (cleaned up). As to the second prong, the appellant must establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 550. Ineffective assistance claims must be firmly and affirmatively founded in the record. *See In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.).

Here, J.R. argues by her third issue that her trial counsel was ineffective by failing to inform her whether her trial would be before the jury or before the bench.[12] However, even assuming that this constituted ineffective assistance, J.R. does not explain how it prejudiced her ability to present her case at trial. *See In re M.S.*, 115 S.W.3d at 550.

J.R. further contends that her trial counsel was ineffective because he failed to call her father as a trial witness. The record reflects that, after the trial pronounced judgment, J.R.'s father asked the court why he was not called to testify. The trial court replied: "Well, nobody wanted to hear from you apparently." J.R.'s counsel confirmed that he "made a decision not to call" J.R.'s father as a witness, but counsel did not explain the reasoning behind this decision. The record does not reflect what J.R.'s father would have testified to or how his testimony would have affected the case, if at all.

"We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Here, in the absence of evidence as to any strategic reasons for counsel's behavior, we must conclude that J.R. has not overcome the strong presumption that counsel's conduct fell "within the wide range of reasonable professional assistance." *In re M.S.*, 115 S.W.3d at

---

[12] At a hearing prior to trial, J.R. complained that her attorney was not present and that he is "very busy" and "doesn't come back until a couple of days before we have court . . . ."

545.[13]  J.R.'s third issue is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Justice

Delivered and filed the 27th
day of December, 2018.

---

[13] J.R. additionally argues that she was "denied the right to subpoena the witnesses she wanted present at trial," but she does not refer to any point in the record evidencing this alleged denial.