**Affirmed and Memorandum Opinion filed March 5, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00867-CV

## IN THE INTEREST OF R.O.D.S. AKA JANE DOE

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2017-04092J**

## M E M O R A N D U M     O P I N I O N

S.A.W. ("Mother") appeals from a final decree terminating her parental rights and appointing the Texas Department of Family and Protective Services ("the Department") as sole managing conservator of her daughter, R.O.D. ("Rachel").[1] On appeal, Mother contends the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in Rachel's best interest. We affirm.

---

[1] We use pseudonyms to refer to appellant, the child, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Texas Department of Family and Protective Services Investigation*

On August 10, 2017, the Department received a referral alleging abandonment of Rachel by Mother. According to the report, a neighbor discovered Rachel, a newborn infant, at 5:30 a.m. outside on the ground between two air conditioner units at Mother's apartment complex. Rachel was unclothed and covered in dirt and fire ants. Rachel's umbilical cord was still attached, exposing her to the risk of neo-natal sepsis. Rachel was immediately taken to a local hospital. She had a body temperature of 91 degrees and required emergency medical care. According to the report, if Rachel had been left outside much longer her heart would have stopped and she would have died.

A Department investigator interviewed Rachel's father ("Father") the same day Rachel was discovered outside at the apartment complex. Father informed the investigator that although he and Mother lived together, he did not know Mother had been pregnant. He explained that he had some suspicions as a result of her missed menstrual cycles and weight gain, but Mother denied that she could be pregnant. Father showed the Department investigator a photograph of Mother from two weeks earlier and the investigator confirmed that Mother did not appear to be pregnant. Father was distraught and shocked at the news about Rachel. Father informed the investigator that he wanted to accept full responsibility for Rachel.

The investigator also spoke with Mother. Mother informed the investigator that she never knew she was pregnant. Mother said that she missed her menstrual cycle and experienced lower back pain, but she never believed she could be pregnant. Mother told the investigator that she did not know she was pregnant until she was giving birth. Mother said that she gave birth around 11:30 p.m. on August 9, 2017. Father was in the other room of the apartment while she was giving birth,

but she did not want to ask him for help. Mother told the investigator that she did not want Rachel to die, but that she was not ready for the responsibility of being a mother. Mother further stated that she "does not want anything to do with the child."

The Department investigator spoke with the paternal grandmother ("Paternal Grandmother"), who indicated that she was "more than willing" to care for Rachel. Paternal Grandmother said she suspected Mother was pregnant because Mother had gained weight, but Mother never confirmed her pregnancy. Paternal Grandmother was shocked to learn that Mother had abandoned her own newborn baby. Paternal Grandmother has known Mother since Mother was a young child and stated that Mother had "always been a good girl."

The Department investigator also interviewed Mother's mother ("Maternal Grandmother"), who also expressed shock at the news. Maternal Grandmother described Mother as caring, lovable, and shy. Maternal Grandmother indicated her desire to be considered as a potential caregiver for Rachel.

The investigator also spoke with a neighbor in the apartment complex who was familiar with Mother and Father. The neighbor was surprised to learn of Mother's pregnancy because she had seen Mother at the swimming pool two weeks earlier and Mother did not appear to be pregnant.

Within a few days of the child's birth, the trial court named the Department emergency temporary managing conservator of Rachel. Mother was charged with child endangerment to which she entered a plea of "guilty" and was sentenced to four years' confinement. The Department approved a home-study of Paternal Grandmother's residence. Shortly thereafter, the Department placed Rachel with Paternal Grandmother. Before trial commenced, Father signed an irrevocable affidavit of voluntary relinquishment of his parental rights. Testimony adduced at

trial indicated Father wanted Paternal Grandmother to adopt Rachel.

**B. *The Trial***

Trial commenced in August 2018. Mother was the first witness to testify. Mother admitted to leaving newborn Rachel outside on the evening of August 9, 2017, immediately after Mother had given birth to her. Mother then went back inside and went to sleep. Mother testified that she completed as much of her family service plan as she could while she was incarcerated. According to Mother, she would have a job waiting for her when she returned home. Mother confirmed that she did not expect the judge to give Rachel back to her immediately but pleaded that her parental rights not be terminated. Mother intends to continue her family services once she is released from jail. According to Mother, she has a supportive family who will help her when she returns home.

The Department's caseworker, Seandra Arceneaux, explained that Rachel was currently placed with Paternal Grandmother and doing well. Paternal Grandmother ensures that Rachel attends all of her medical appointments and physical therapy appointments. According to Arceneaux, Rachel is "very bonded" with Paternal Grandmother. Rachel's eyes light up when Paternal Grandmother walks into the room. Arceneaux observed that Rachel seeks Paternal Grandmother when she needs comfort. Arceneaux testified that she believed it would be detrimental to remove Rachel from Paternal Grandmother's care.

Arceneaux testified that Mother had not completed all her services due to her incarceration. According to Arceneaux, visits between Maternal Grandmother and Rachel go well and Arceneaux recommended that those visits continue. Arceneaux stated that she believes it is in Rachel's best interest to have Mother's parental rights terminated.

4

Finally, Maternal Grandmother testified that she wants to continue visitation with Rachel regardless of the outcome of the trial.

Following arguments by counsel and a recommendation by the attorney ad-litem that Mother's parental rights be terminated, the trial court determined that Mother's parental rights to Rachel should be terminated pursuant to the predicate findings under Family Code sections 161.001(b)(1)(D), (E), (L), (O) and (Q) and that termination of Mother's parental rights was in Rachel's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1) (D), (E), (L), (O), (Q) & (2). The trial court signed a final decree terminating parental rights and appointing the Department as sole managing conservator.

## II.    ISSUE AND ANALYSIS

In a single issue, Mother argues the evidence is factually insufficient to support the finding that termination of Mother's parental rights is in Rachel's best interest. Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother concedes that the trial court had adequate grounds to terminate her parental rights under subsections (D), (E), (L), (O), and (Q).

### A. Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.–Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to

5

recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.–Houston [14th Dist.] 2008, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## B. Best Interest of the Child

Texas courts presume that keeping a child with the child's natural parent serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section

161.001(b)(1) is probative of the issue of the child's best interest. *See In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The considerations the trier of fact may use to determine the child's best interest, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment). A best-interest finding does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

Mother contends the Department failed to meet its burden to rebut the presumption that keeping Rachel with her natural parent would be in the child's best interest. The Department argues that Mother's "apparent attempt to kill" Rachel, along with Mother's absence from Rachel's life due to Mother's incarceration suffices to rebut the best-interest presumption.

## 1. The child's desires

Rachel was twelve months old at the time of trial, and, therefore, too young to communicate her desires. When a child is too young to express the child's desires, the fact finder may consider that the child has bonded with the foster family, is receiving good care in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Arceneaux, the Department's caseworker, testified that Rachel is bonded with Paternal Grandmother. Arceneaux further testified that Rachel is receiving good care in the current placement. Because Mother abandoned Rachel at birth and pleaded "guilty" to endangering her, Mother has spent minimal time with Rachel. This factor weighs in favor of the trial court's finding.

## 2. Present and future emotional and physical needs of the child

Mother contends that because Rachel suffered no long-term physical consequences as a result of her abandonment, this factor weighs in favor of Mother. Yet, Mother subjected Rachel to the risk of neo-natal sepsis and left her on the brink of death when she abandoned her. A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future. *Id*.

Moreover, Rachel survived Mother's abandonment only because a neighbor rescued the child. The child owes her state of good health to Paternal Grandmother's care. Paternal Grandmother and Rachel share a strong bond. Rachel looks to Paternal Grandmother for comfort. Arceneaux testified that removing Rachel from Paternal Grandmother's home would be detrimental to Rachel. This factor weighs in favor of the trial court's finding.

## 3. The parental abilities of the individuals seeking custody

8

Mother contends this factor weighs in her favor because she has completed all of her parenting classes and participated in individual therapy. Though Mother has taken actions to develop parenting skills, she abandoned Rachel under conditions that jeopardized the child's health and life. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, a fact finder may measure a parent's future conduct by the parent's past conduct and determine that it is in the child's best interest to terminate parental rights. *See In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at *16 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.). At the time of trial, one-year old Rachel was happy and healthy in Paternal Grandmother's home and had been there for over eight months. Paternal Grandmother allows for visits between Rachel and Maternal Grandmother. Paternal Grandmother ensures Rachel attends all her doctor's appointments and tends to the child's daily needs. This factor weighs in favor of the trial court's finding.

### 4. Stability of the home or proposed placement

A child's need for permanence through the establishment of a "stable, permanent home" has sometimes been recognized as the paramount consideration in a best-interest determination. *See re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). The stability of the proposed home environment is a crucial factor. *See In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Rachel has been in Paternal Grandmother's care since she was five moths old. Paternal Grandmother is the only parent Rachel has ever known. Arceneaux testified she has no concerns with Paternal Grandmother's ability to care for Rachel. Because Mother was incarcerated at the time of trial, she could not provide a stable home for Rachel. This factor weighs in favor of the trial court's finding.

9

*5. Programs available to assist in promoting the child's best interest*

Mother testified that she intends to continue receiving services after she is released from custody and that she has completed as much of her service plan as she could while in custody. Arceneaux confirmed that Mother had completed as much of her service plan as possible. Mother's completion of some services and her willingness to continue with them weighs in her favor.

*6. Plans for the child*

Mother testified she planned to return to her job and complete her services. Arceneaux testified that Paternal Grandmother wants to adopt Rachel. Though evidence shows Mother plans and desires a life with Rachel, Mother has no track record that would suggest her plans for Rachel would be successful or that she is capable of caring for the child. The record contains ample evidence that Paternal Grandmother already is providing a positive, stable home for Rachel and wants to make that arrangement permanent through adoption. Arceneaux testified that it was in Rachel's best interest for Paternal Grandmother to adopt the child. On balance, this factor weighs in favor of the trial court's finding.

*7. The parent's act or omissions which may indicate the parent-child relationship is not a proper one*

Mother left newborn Rachel outside, unprotected and exposed to danger for six hours while Mother was inside sleeping. When confronted with the abandonment, Mother told the Department investigator that she did not "want anything to do with the child." Mother pleaded "guilty" to child endangerment and has been incarcerated for most of Rachel's life. Mother's choices, actions, and omissions left Rachel at risk. This factor weighs in favor of the trial court's finding.

Applying the *Holley* factors to the evidence, we conclude that factually sufficient evidence supports the trial court's finding that termination of Mother's rights is in Rachel's best interest. We overrule Mother's sole appellate issue.

### III. CONCLUSION

Having concluded the evidence is factually sufficient to support the trial court's finding that termination is in Rachel's best interest, we affirm the trial court's judgment.


/s/    Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.

11