**AFFIRMED; Opinion Filed March 15, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-01254-CV

### IN THE INTEREST OF K.K., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-17-00489-X**

# MEMORANDUM OPINION

Before Justices Schenck, Molberg, and Carlyle
Opinion by Justice Schenck

Both Mother and Father separately appeal the trial court's order terminating their parental rights to K.K. Father's appellate attorney has filed a brief asserting Father's appeal is frivolous and without an arguable issue on appeal. *See Anders v. California*, 386 U.S. 738 (1967). Mother challenges the sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of K.K. We affirm the trial court's termination order. Because the dispositive issues in this case are settled in law, we issue this memorandum opinion. See TEX. R. APP. P. 47.4.

## BACKGROUND

K.K. was born in July 2016 to Mother and Father, who were not married, but lived together. On April 1, 2017, the Texas Department of Family and Protective Services (the "Department") received a referral of neglectful supervision of a child, K.K., by Mother and Father. At that time, K.K. was approximately eight months old. The referral alleged that Mother and Father were

abusing intravenous drugs while caring for K.K., which significantly impaired their judgment and ability to provide adequate care and supervision to K.K., and that K.K. had sustained a burn to a vital body area as a result of inadequate supervision by Mother.

The Department conducted an investigation and requested that both Mother and Father submit to drug testing. Father agreed to do so, but never did so thereafter. Mother provided the Department with a urine specimen and a hair sample for testing. Mother's follicle sample tested positive for methamphetamine. Mother then confessed to the investigator that, in December 2016, after completing a nine-week program for substance abuse, she relapsed, and that she had used methamphetamine a few days prior. She further admitted she was the victim of domestic violence and that Father was the perpetrator. Due to Mother's positive drug test result, and admission that she had recently used methamphetamine, the Department removed K.K. from the home and placed her with family friends, Kimberly Marshall and Ashley Polley, who agreed to care for K.K. while Mother attempted to regain custody. After K.K. was removed, the investigator interviewed Father. He admitted he drank alcohol and used drugs daily; acknowledged that he had a lengthy criminal history; and conceded that there was presently a warrant outstanding for his arrest.

On May 19, 2017, the Department filed a petition for K.K.'s protection and conservatorship and for termination of Mother's and Father's parental rights. In June 2017, the trial court named Kimberly Marshall the temporary managing conservator of K.K. and ordered Mother and Father to complete parenting classes, psychological evaluations, individual counseling, drug/alcohol assessment and treatment, and random drug and alcohol urinalysis/hair strand testing.

In April 2018, Marshall informed the Department that she could no longer care for K.K. and no longer had confidence that Mother was doing the things she needed to do to reunite with K.K. Mother did not have a family member who was willing and able to care for K.K., so the Department placed K.K. in a foster home.

The case proceeded to trial before the court over several days throughout the spring and summer of 2018. At that time, Father was incarcerated and had been so since December 2017, following an altercation with Mother,[1] and Mother was living at an extended stay hotel, pregnant with a child fathered by someone else. Mother planned to give that child up for adoption through an agency. The agency agreed to pay for Mother's hotel room, cell phone, and some living expenses and would do so for six weeks following the birth of the child.

The conservatorship worker testified that initially Mother did not participate in the court ordered services. Mother claimed a lack of transportation and legal issues prevented her from doing so. Mother went to jail in September 2017, and was released the following month. She began services in 2018, and, at the time of trial, she had completed some, but not all, of the services. More particularly, Mother had completed her psychological evaluation, her drug assessment and her parenting class but had not completed her substance abuse counseling, a critical service for Mother. Father did not participate in any of his court-ordered services.

Polley testified that while she and Marshall cared for K.K., the parents' visits were sporadic. When Mother visited alone, the visits were appropriate, and she appeared to bond with the child. When both parents visited, the atmosphere was different, and Polley felt very uncomfortable. On a couple of occasions, Mother and Father appeared to be under the influence of alcohol or drugs, and they fell asleep during the visit. Although the parents sometimes provided formula, clothing, and diapers for K.K., while they were receiving government support, neither parent provided any financial support.

Polley described K.K. as a "sickly baby," with breathing problems, a misshaped head, some hearing loss on her left side, and a "reverse tongue" that made swallowing difficult. Also, K.K.'s speech was delayed, and she had behavioral issues. Polley described K.K. as "high maintenance"

---

[1] Father did not appear or testify at trial and he was represented by court appointed counsel.

requiring special attention, and numerous doctor appointments, treatments, and therapy.

Polley indicated that while Mother is a very caring mom, she had not fully prioritized K.K. since her removal, and she did not believe that Mother was ready to have K.K. returned to her. Polley described Mother's toxic relationship history and lifestyle of drugs and abuse. She was concerned, knowing Mother's past, that Father would be back in the picture when he was released from prison.

At the time of trial, K.K. had been in foster care for approximately two months. K.K.'s foster parent testified that she had bonded with K.K. and was interested in adopting her. She was employed as a health care staffer and had previously worked as a special education teacher, trained in sign language. She indicated she had been working with K.K. on her communication and eating issues and had seen progress during the time K.K. had been in her care. K.K.'s foster parent indicated that it takes 25 minutes to supervise K.K. while she is eating a meal and that supervision is extremely important because, due to her "reverse tongue," K.K. could choke while eating. She explained that K.K. was now in therapy to address her speech and feeding issues and to work on specialized skills.

K.K.'s foster parent owns a single family home with three bedrooms, two bathrooms, and a large yard. Although she had fostered other children in the past, K.K. was the only child living with her at the time of trial. K.K.'s foster parent described the structured environment she had created for K.K. and indicated that K.K. was responding well to same.

The conservatorship worker testified that the Department opposed the reunification of K.K. with Mother because Mother was living in a hotel and was not financially stable, and because of a concern that when Father is released from prison, possibly in February 2019, he and Mother would reunite and engage in further drug use and violence. The Department did not believe that Mother had prioritized what was in the best interest of K.K. and believed that Mother continued to pose

an immediate danger to K.K. if she was immediately returned to Mother, and that it was in the best interest of K.K. that the parental rights be terminated. The conservatorship worker testified that K.K.'s foster placement gave her the one-on-one care and attention she needed and was even better than her prior placement with Polley and Marshall, which was in itself very good. Accordingly, the conservatorship worker indicated that the Department's long term plan was to have K.K.'s foster parent adopt her.

The Court Appointed Special Advocate ("CASA") volunteer assigned to K.K. testified that K.K. should stay in her current foster placement because Mother was not ready to take her. Mother had no plan in place past the birth of her second child, no job, and nowhere to live once the adoption agency stopped paying for the room at the extended stay hotel. Mother had not prioritized K.K., and she still had a lot of work to do. The CASA volunteer explained that she had visited K.K.'s foster parent and K.K. at the foster parent's home, and she observed K.K. enjoying her new home.

Mother's therapist testified that he began working with Mother in February 2018 and that she had recently successfully completed her individual counseling. Through counseling, Mother had learned some healthy ways of thinking and living and had demonstrated the ability to implement what she had learned. The therapist testified that he did not believe Mother to be a physical or emotional danger to K.K. But he did concede that Mother remained in transition and that she was not capable "right now" of assuming the responsibility of taking care of K.K.

Mother's substance abuse counselor testified that Mother began counseling with her in February 2018. She had not yet completed her counseling, but was on course to finish in August 2018. The counselor characterized Mother's attitude during counseling as very positive and hopeful. She believed Mother had developed coping skills and had been educated on what to do to not relapse. Nevertheless, she did not believe K.K. should be returned to Mother's care.

K.K.'s maternal grandmother and Mother's stepfather testified at trial. Grandmother was not surprised when the Department got involved in this case because Mother and Father were having issues. She admitted that the Department was justified in removing K.K. from Mother's care because Mother was in an abusive relationship and was using drugs. When asked whether Mother had asked her to care for K.K., Grandmother responded she had not because Mother knew she was already overtaxed in taking care of two other grandchildren and Mother's sister. Nevertheless, Grandmother testified that going forward, Mother and K.K. are welcome to stay at her house, if they have no other option, and that she would be a support system for them. She conceded, that due to her other financial commitments, she will not be able to financially support Mother and K.K. As to the suitability of Grandmother's home as a possible home for K.K., the State presented evidence that Grandmother's daughter who lives with her brings different men into the house, the daughter and the men use drugs, and there is a complete lack of structure and discipline in the home.

Mother's stepfather, who is now married to someone other than Grandmother, testified that he is supportive of Mother getting K.K. back and that he is a support system for her. He indicated that Mother is welcome in his home any time. When asked why she had not previously moved in with him, he responded that she is too proud.

Mother testified that she had known Father since May 2015, and that they were each other's enablers in drug use. She described her relationship with Father as "toxic." She explained that during her pregnancy with K.K., they were sober for several months. After K.K. was born, Mother stayed home while Father worked construction jobs. When K.K. was six or seven months old, they relapsed and began drinking and using drugs. Mother admitted to physical abuse by Father and claimed that after Father beat her up in October 2017 she knew she had to end the relationship.

Mother claimed to have leased an apartment and was scheduled to move in on August 1,

2018.  She indicated that she planned to obtain employment after she delivers her second child and to finish her associate's degree.

Mother admitted that she had not completed her court ordered substance abuse counseling. She explained the delay in starting her services was due to her need to address her legal issues. She had a theft charge and a felony probation violation.  She turned herself in and served a three-week sentence and took a time served plea, which resulted in a felony conviction.

Mother testified that she had recently purchased a vehicle to resolve her transportation issues.  She indicated that she is bonded with K.K. and loves her very much.  Mother claimed that through counseling she had learned how to ask for help, developed a support system, and obtained the resources to cope with life.  She asked the court to return K.K. to her.

At the conclusion of trial, the trial court found Mother's and Father's parental rights should be terminated as to K.K. pursuant to sections 161.001(b)(1) D, E and O of the family code,[2] and that it is in the best interest of K.K. to appoint CPS as Permanent Managing Conservator.  This appeal followed.

## DISCUSSION

### I.    FATHER'S APPEAL

Father's counsel filed an *Anders* brief.  When reviewing an *Anders* brief, this Court is not required to review the merits of each claim raised in the brief or a pro se response.  *Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).  Instead, this Court's duty is to determine whether there are any arguable grounds for reversal and, if so, to remand the case to the trial court

---

[2] Section 161.001(b)(1)(D) allows for termination if the parent knowingly allowed the child to remain in conditions or surroundings which endanger the physical and emotional wellbeing of the child.  TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination if the parent engaged in conduct which endangers the physical and emotional well-being of the child. *Id.* § 161.001(b)(1)(E). Section 161.001(b)(1)(O) allows for termination if the parent failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *Id.* § 161.001(b)(1)(O).

so that new counsel may be appointed to address the issues. *Id.*; *In re D.D.*, 279 S.W.3d 849, 850 (Tex. App—Dallas 2009, pet. denied).

In the case before us, the *Anders* brief filed by Father's appellate counsel presents a professional evaluation of the record demonstrating why there are no arguable grounds for reversal and concluding that Father's appeal is frivolous and without merit. *Anders*, 386 U.S. at 744. Counsel conducted a thorough review of the record and analysis of the legal and factual sufficiency of the evidence about whether Father failed to complete any of the services he was ordered to complete, a statutory ground for termination. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the best interest of a child in a termination case. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

A copy of the *Anders* brief was delivered to Father, who was notified of his right to review the record and file a pro se response. Father has not filed a pro se response. We have independently reviewed the entire record and counsel's brief, and we agree that Father's appeal is frivolous and without merit. We find nothing in the record that could arguably support the appeal. Accordingly, we affirm the trial court's order terminating Father's parental rights.

We note Father's counsel's request that we grant Father's motion to remove her from her representation of Father. Neither Father nor his counsel has filed any such motion. We note that in a parental-rights termination matter, a court-appointed attorney's motion to withdraw in the court of appeals may be premature unless good cause is shown. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016). At this point, counsel has not shown good cause for withdrawing. *See id.*; *In re Y.D.*, No. 05-16-00410-CV, 2016 WL 4701438, at *1 (Tex. App.—Dallas Sept. 8, 2016, no pet.) (mem. op.) (no good cause shown where only ground for withdrawal was that appeal was frivolous). Consequently, counsel's obligations have not been discharged. *See In re P.M.*, 520

S.W.3d at 27–28. If Father, after consulting with counsel, desires to file a petition for review, counsel is still under a duty to timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.*

## II.   MOTHER'S APPEAL

In her sole issue on appeal, Mother urges the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of K.K.

### A.   Standards of Review and Applicable Law

When the legal sufficiency of the evidence is challenged, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When the factual sufficiency of the evidence is challenged, we then consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

A court may terminate a parent-child relationship if it finds by clear and convincing

–9–

evidence (1) one or more statutory grounds for termination and (2) that termination is in the child's best interest.  FAM. § 161.001(b)(1)–(2).  Clear and convincing evidence is proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  *Id.* §101.007.  Here, Mother challenges only the sufficiency of the evidence to support a finding that termination of her parental rights is in the best interest of K.K.

A strong presumption exists that the best interest of the child will be served by keeping the child with a natural parent.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).  In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including (1) the child's desires, (2) the child's age and emotional and physical needs now and in the future, (3) any emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the plans for the child by those individuals and the stability of the home, (6) the plans for the child by the agency seeking custody and the stability of the proposed placement, (7) the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one, and (8) any excuse for the acts or omission of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).  A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety.  *In re C.H.*, 89 S.W.3d at 27.  Evidence of section 161.001(b)(1) termination grounds may also be probative of a child's best interest.  *Id.* at 28.

### B.  Application of the Law to the Facts

In this case, we consider the following relevant factors: the desires of the child; the child's age and emotional and physical needs now and in the future; the emotional and physical danger to

the child now and in the future; the parental abilities of the person seeking custody; the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and the stability of the home or proposed placement.

### 1. Desires of the Child

At the time of trial, K.K. was less than two years old. When children are too young to express their desires, the fact finder may consider whether the children have bonded with the foster family, are well cared for by them, and have spent minimal time with a parent. *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The evidence shows K.K. has bonded with her foster parent, and is happy and well cared for in the foster home. Mother correctly contends that there is evidence that she is well bonded with K.K., but the evidence also establishes that Mother's visitation during the pendency of this case was sporadic and included some visits where Mother appeared to be under the influence of alcohol or drugs. From this evidence, the trial court could have found this factor weighed in favor of terminating Mother's parental rights. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.).

### 2. The Child's Age and Emotional and Physical Needs Now and in the Future

Mother contends that the record shows that she cared for K.K. for the first seven to eight months of her life without State involvement and alleges that there was no evidence to indicate that she would not be able to adequately provide for the child's needs now or in the future. But the record shows that Mother failed to recognize or address K.K.'s special needs while K.K. was in her care, suggesting Mother was not meeting the child's needs or providing a safe environment during those initial months. *See* FAM. §§ 263.307(b)(12)(B), (F).

As to meeting K.K.'s future emotional and physical needs, because of K.K.'s age and special needs, she will need the support of her caregiver for many years. K.K. needs a stable home environment and the financial resources to address her special needs. At the time of trial, Mother

resided in an extended stay hotel that was not conducive for a child. Financing for her temporary residence and living expenses were scheduled to end six weeks after Mother delivered her second child. Mother was unemployed and had no definitive plan or place of future employment.

The primary concerns of the Department were that Mother did not have a stable home or income and had no plan for caring for the child. These same concerns were echoed by the CASA volunteer. While Mother claims to now have support systems, the evidence shows Grandmother's home is not a viable option for K.K., Mother has refused to stay at her stepfather's home in the past, and any financial assistance her stepfather may provide is unsubstantiated and uncertain. While Mother claims she plans to get a job after she delivers her second child, she did not set forth a plan for doing so going forward or otherwise explain how she could maintain a home on her own.

Moreover, Mother's therapist testified that Mother was not ready to assume the responsibilities of caring for K.K. despite her personal achievements through individual counseling. The trial court could have reasonably considered that based on the child's special needs, Mother's uncertain financial situation, and Mother's past history, Mother would not be able to provide a safe environment for K.K. *See In re J.R.W.*, 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.) (stating, "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs."); *Adams v. Tex. Dept. of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.— Houston [1st Dist.] 2007, no pet.) (holding a parent's history of failing to provide children with consistent and stable environment supports finding that termination of parental rights is in children's best interest).

### 3. The Emotional and Physical Danger to the Child Now and in the Future

The trial court found, and Mother does not challenge, that Mother had knowingly placed K.K. in conditions or surroundings which endangered the physical and emotional well-being of the child and engaged in conduct which endangered the physical and emotional well-being of the child. FAM. §§161.001(b)(1)(D), (E). Unchallenged grounds for termination can be sufficient to support a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). The trial court's best interest finding was supported by Mother's history of substance abuse, domestic violence, and periods of incarceration. *See* FAM. §§ 263.307(b)(7), (8), (12).

Mother admitted to a history of substance and alcohol abuse and tested positive for methamphetamines. The record shows a history of relapse despite her completion of a nine-week rehabilitation program, including when K.K. was six or seven months old and then again after the referral to the Department. *See Dupree*, 907 S.W.2d at 86 (holding that parents' "drug-related conduct is a significant factor" to which the factfinder "could have attached great weight in evaluating the best interests of the child"). Although Mother claimed to not use drugs while caring for the child, Mother's negligent behavior resulted in an unsafe environment, which resulted in the child sustaining a cigarette burn to the forehead.

Further, the record shows a history of domestic violence in the home. Mother characterized her relationship with Father as "toxic." She admitted to the existence of domestic violence while the child was in the home. The record shows that domestic violence continued during the pendency of this case. *See In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (relying in part on "history of assaultive conduct between the mother and the father" in affirming best-interest finding). Additionally, Mother had a history of toxic relationships and drug abuse prior to meeting Father. Polley testified that each time she aided Mother in leaving a toxic

relationship, she would watch as Mother returned to the same lifestyle. Notwithstanding Mother's demonstrated inability to provide a safe environment for one child, Mother became pregnant with another child during the pendency of this case.

Although there was testimony concerning positive steps toward sobriety and her termination of her relationship with Father, the trial court, as factfinder, may fairly measure a parent's future conduct by her past when determining whether termination is in a child's best interest. *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Furthermore, the trial court may reasonably infer possible endangerment to the child upon release of Father based upon Mother's prior conduct, and history of regressing to toxic relationships, despite Mother's claims to the contrary. *See O.N.H.*, 401 S.W.3d at 684.

### 4. Parenting Abilities and Explanations for Parent's Acts or Omission

Willingness and ability to complete counseling services and effect positive personal changes within a reasonable period of time are factors for the trial court to consider under a best-interest finding. *See* FAM. §§ 263.307(b)(10), (11). Mother does not challenge the trial court's finding she failed to comply with the provisions of the court's order that specifically established actions necessary for her to obtain the return of K.K. *Id.* § 161.001(b)(1)(O); *In re C.H.*, 89 S.W.3d at 28. The record shows the trial court ordered specific services for Mother to complete in order to obtain return of the child. Mother failed to complete her court-ordered substance abuse counseling prior to trial. *See In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (determining a parent's failure to complete just one requirement of the service plan supports termination). The case had been pending for nearly 15 months when the trial ended. At trial, Mother explained that the delay in getting services started was due to her need to address her legal issues. However, the record shows that Mother waited five months after the

–14–

commencement of this case to resolve her legal issues. Mother's delay in prioritizing her child and completing her service was evidence for the court to consider in its best-interest determination. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that evidence of the appellant's failure to comply with the court-ordered service plan supported the trial court's best-interest determination).

### 5. Plans for Placement and Placement's Stability

The conservatorship worker testified that the Department's long-term plan for K.K. was for her to be adopted by her foster parent. K.K.'s foster parent has expressed an ongoing interest in adoption. She is willing and capable of assisting K.K. with her special needs. In contrast to Mother, the record shows that K.K.'s foster parent was financially stable, had a secure home, and was fluent in sign language to aid in communicating with K.K. Further, there was testimony that K.K. was happy and bonded with her foster parent. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (holding that children's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination). Based upon the extended duration of this case, permanent placement of the child favored the trial court's best-interest determination. *See id.*

After considering the evidence and the relevant factors under the appropriate standards of review, we hold that the evidence presented at trial and summarized above is legally and factually sufficient to reasonably establish a firm belief or conviction that termination of Mother's parental rights is in K.K.'s best interest. *See* FAM. § 106.001(2); *Holley*, 544 S.W.2d at 371–72. We overrule Mother's sole issue.

**CONCLUSION**

We affirm the trial court's order terminating Mother and Father's parental rights.


/David J. Schenck/
DAVID J. SCHENCK
JUSTICE


181254F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.K., A CHILD,

No. 05-18-01254-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-17-00489-X.
Opinion delivered by Justice Schenck.
Justices Molberg and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 15th day of March, 2019.