

# NUMBERS 13-21-00160-CV & 13-21-00161-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.A.Z., A.A.Z., AND A.A.L., CHILDREN

### On appeal from the 156th District Court
### of Live Oak County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva**
**Memorandum Opinion by Chief Justice Contreras**

Appellants A.G. and J.G.L. perfected separate appeals from the trial court's order terminating their parental rights. In appellate cause number 13-21-00161-CV, A.G., the biological mother of A.A.Z.1, A.A.Z.2, and A.A.L.,[1] argues the evidence was legally and factually insufficient to support grounds for termination under family code § 161.001(b)(1)(O) or to support a finding that termination was in the children's best

---

[1] We refer to the children and their family members by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2). Because the two eldest children share the same initials with their biological father, we refer to them as A.A.Z.1 and A.A.Z.2.

interest. In appellate cause number 13-21-00160-CV, court-appointed appellate counsel for J.G.L., the biological father of A.A.L., has filed a brief stating he has identified no arguable grounds for appeal. We affirm in both cause numbers.

## I.  BACKGROUND

A.A.Z.1, a girl, and A.A.Z.2, a boy, were born to A.G. and father A.A.Z. in 2012 and 2015, respectively. A.A.L., a girl, was born in 2017. Appellee, the Texas Department of Family and Protective Services (the Department), filed its petition seeking termination of appellants' parental rights on August 6, 2019.[2] The final termination hearing was held via video conference on April 12, 2021, at which time the children were nine, six, and three years old, respectively. Both appellants were represented by counsel.

Olivia Cote, a Department caseworker, testified the Department received a report that the children were locked out on the patio of their second-story apartment, that the apartment was "very dirty," and that there was substance abuse. At the time of this report, there was already an active family-based safety services (FBSS) case pending, and the children had previously been removed and placed with J.G.L.'s parents. Cote said there was a safety plan in place requiring J.G.L.'s parents to watch the children and to "not leave the parents alone with them at any time." Because J.G.L.'s parents left the children with appellants unsupervised, they were removed again and placed with A.G.'s mother. They were later removed from that placement as well, placed in a temporary shelter in Calallen, and then a foster home in San Antonio. Because the San Antonio foster parents moved out of state, the children were moved again, and they have been in their current foster home with the Pena family since May 11, 2020. Cote said the children have

---

[2] The petition also sought termination of the parental rights of A.A.Z., the father of A.A.Z.1 and A.A.Z.2. A.A.Z. is not a party to this appeal.

"bonded really closely" with the Penas and are "doing very well." According to Cote, A.A.Z.2 had "severe dental decay" and asthma and A.A.Z.1 needed glasses when they first came into the Penas' care, but they are now receiving treatment. She said the Penas "are going through the licensing protocols" to be able to adopt the children.

Cote said that the Department set up a service plan for appellants which required them to undergo, among other things, counseling and random urinalysis drug tests. However, because appellants did not consistently submit to drug tests, they were asked to attend a residential drug treatment facility, and they agreed to do so in August of 2020. Before A.G. was accepted into the residential treatment facility, she spent several days in the hospital because she was having withdrawal symptoms and "was detoxing from a prescription that she was not prescribed." While appellants were at the residential treatment facility, they maintained contact with the children via video calls, though J.G.L. did not always attend.

J.G.L. was released from inpatient treatment on September 23, 2020, and A.G. was released on November 5, 2020; both appellants moved in with J.G.L.'s parents. On November 16, Cote observed an in-person visitation during which J.G.L. dropped A.G. off with the children while he went out to get food, causing him to miss some of the visit. Additionally, J.G.L. was driving without a valid license. At one time, when the children were walking away from their school, J.G.L. stopped his car in the middle of the street and "approached the children while they were walking through the crosswalk." Another time, A.G. approached the children "unannounced" while they were walking from school, even though the court had already admonished A.G. "not to be doing things like that."

Cote said that, in October of 2020, J.G.L. began missing visitations and appeared sleepy and unable to keep his eyes open during a court hearing; therefore, Cote surmised

3

that J.G.L. was "relapsing into misusing his prescriptions again." On December 9, 2020, J.G.L. left a phone message for Cote in which he was slurring his words and "was very upset" that the children were not returned to appellants after they finished inpatient drug treatment. Cote said J.G.L. called her a "coward" and asked for a new caseworker to be assigned.

Cote read from medical records indicating that, when A.G. was seen by a doctor on February 1, 2021, she "appear[ed] over medicated," had "difficulty completing sentences, loses train of thought," was "confused on what meds she is taking," was "shaking all of [her] extremities," and had large pupils. Cote confirmed that, aside from the time A.G. was just released from treatment, the descriptions in the February 1, 2021 medical records are consistent with her personal observations of A.G. throughout the case.

During a visit at the end of February 2021, both appellants appeared under the influence "of something" because they had "very slurred words" and "scattered brains." According to Cote, J.G.L. "doubled over his own feet" and nearly dropped his drink on multiple occasions; while A.G. "was gone for 45 minutes during that visit in her vehicle, preparing things for the kids, she said." Cote asked appellants to submit to drug tests the following day; they did, and they both tested positive for methamphetamines. Cote said that when she and the court-appointed special advocate (CASA) asked appellants why they tested positive, "they stated because they were told they were never going to get their kids back and they wanted to feel numb." According to Cote, A.G. tested positive for methamphetamines in "early March" of 2021, and on March 29, J.G.L. tested "negative dilute" and A.G. tested positive for her prescribed anxiety medication.

On cross-examination, Cote acknowledged that the Department originally wanted

4

the two eldest children to be placed with their father A.A.Z.; however, A.A.Z. tested positive for methamphetamines and opiates and was not responsive to the Department. She stated J.G.L. told her he was taking anxiety medication three times a day, even though his prescription read two per day. He was also prescribed Suboxone and a sleeping aid. Cote stated the children call J.G.L. "Dad" during his visits. She said that A.G. has been critical of the foster family's care of the children; she once asked A.A.Z.1 whether the Penas "give her too much loving on her bottom" and A.A.Z.1 informed A.G. that "those were her birth marks that she had."

Cote said J.G.L. is "not making any progress" on his service plan, though both appellants previously completed inpatient drug treatment, a parenting class, individual counseling, and family counseling. She said neither parent has provided financial support while the children have been in foster care. A.G. currently works one to three hours per day as a caretaker for her mother-in-law. According to Cote, J.G.L. did not obtain employment after being released from inpatient treatment but "was hoping that he would get disability so that he wouldn't have to work due to his accident that he had had the year prior." However, Cote stated that J.G.L. "currently is not injured."

Cote opined that the children enjoy their visits with appellants, but she said the visits sometimes have "negative effects" due to appellants being under the influence or being late.[3] She said the children once told her "they know that they're not safe and [appellants] don't do safe things for children and that's why they're living with their caregiver right now." The two older children told her about "times where they wouldn't be able to wake up their parents when they were living there; they'd have to feed their baby

---

[3] Patricia Clifton, a CASA volunteer appointed to the case, stated that she observed visitations during which both appellants allowed the children to "play recklessly" and were "not attentive" at times.

sister." Recently, the two older children saw J.G.L. being arrested after a car accident in which he rear-ended another vehicle; Cote opined that the children "were actually more concerned about the lady that he hit because she needed to be taken in an ambulance."[4]

Juanita Pena, the foster mother, testified that A.A.Z.2 is "doing very good" in school whereas A.A.Z.1 "was bringing home As and Bs" but "lately her grades have been going down because of everything that's been happening," such as her father A.A.Z. "stopping contact." She said A.A.Z.1's behavior "is getting a little bit out of hand" and that the child has started therapy. Pena testified that she is willing to adopt the two youngest children but "do[esn't] think [she] could handle [A.A.Z.1]" on a permanent basis. Nevertheless, she asked to remain A.A.Z.1's caregiver until the Department can find another placement.[5]

A.G. testified that she has been on prescription medication since she suffered back injuries while powerlifting at the age of sixteen. She said she attended rehab because she was addicted to opiates and she believed the treatment would help her and her case to have the children returned to her.[6] A.G. admitted she had a "relapse" of her drug problem

---

[4] Martin Ramos, a George West police officer who responded to the accident, testified that J.G.L. was unable to produce a valid driver's license and appeared impaired, though Ramos did not know whether that was the cause of the accident. Ramos stated that he arrested J.G.L. for possession of a controlled substance after finding a bottle in the car containing pills and an empty plastic bag with the words "Stay high" printed on them. According to Ramos, J.G.L. claimed that the pills in the bottle were Xanax and that he had a prescription. Ramos did not observe any children at the scene.

[5] At closing, the attorney ad litem appointed for the children stated that Pena "probably doesn't want the older two children permanently."

[6] The Department argues that A.G. appeared to acknowledge she will "always" have a drug problem during her direct examination:

| Q. [A.G.'s counsel] | You had a drug problem. Well, you—you're always going to have a drug problem, aren't yeah [sic]? |
| Q. [A.G.'s counsel] | |
| A. [A.G.] | (Laughter.) |
| Q. | Aren't you? I mean, that's always something that you guys— |
| A. | Yeah. |
| Q. | —suffer from, isn't it? |
| A. | They say once you are, you always are. |

in March of 2021 because she had a "breakdown" after Cote advised her the Department would be recommending her rights be terminated. A.G. said she "ha[sn't] even thought about doing that ever again." She said she previously worked in food service and recently "finished all the paperwork" to start a job at Tex Best, a convenience store. She conceded that she has not provided Pena with any cash support. A.G. stated that her children have told her they want to come home with her.

J.G.L. testified that he injured his hand "[w]ith a blade" while working in construction in June of 2019 and is not supposed to lift anything over ten pounds. He said his father pays him $200 per week to provide care for his mother. He said: "I'm trying to [wean] myself off of my anxiety meds, my Subox, and I take my Suboxone and my Amitriptyline and my depression pill." He admitted using methamphetamine with A.G. after they learned the Department would be recommending termination. On cross-examination, J.G.L. admitted he had previously been sent to a substance abuse felony punishment facility (SAFPF) for opiate abuse on three different occasions.

As to both appellants, the trial court found grounds for termination under parts (O) and (P) of family code § 161.001(b)(1). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (authorizing termination if the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child"); *id.* § 161.001(b)(1)(P) (authorizing termination if the parent "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment program; or

7

(ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance"). It further found that termination of appellants' parental rights and permanent managing conservatorship with the Department was in the best interest of the children. *See id.* § 161.001(b)(2). These appeals followed.

## II. A.G.

### A. Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE. ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

8

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266. Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

## B.    Predicate Grounds

By her first issue on appeal, A.G. contends that the evidence was legally and factually insufficient to support the trial court's finding of predicate grounds for termination under part (O) of family code § 161.001(b)(1). *See* TEX. FAM. CODE ANN.

§ 161.001(b)(1)(O). However, she does not dispute that the evidence was sufficient to support the trial court's finding of grounds for termination under part (P) of that statute. Accordingly, consideration of A.G.'s first issue is not necessary to the final disposition of the appeal, and we do not address it. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."); *see also* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").[7]

## C.    Best Interests

By her second issue, A.G. argues the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest. There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Factors that we consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

---

[7] The Texas Supreme Court has held that, regardless of whether other grounds for termination are unchallenged on appeal, an appellate court must always review issues alleging the evidence was insufficient to support findings of endangerment under parts (D) or (E) of family code § 161.001(b)(1). *In re N.G.*, 577 S.W.3d 230, 234, 237 (Tex. 2019) (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under § 161.001(b)(1)(M)). The trial court did not make findings under parts (D) or (E) in this case, and there is no similar due process concern regarding a finding under part (O).

parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all of these factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27.

As to the first factor—the desires of the child—Cote appeared to agree that A.A.Z.1 and A.A.Z.2 stated they did not want to return to live with their parents at the present time.[8] A.G. testified that the children told her they want to come home with her; however, it would not have been unreasonable for the trial court to discredit that testimony. *See In re L.J.N.*, 329 S.W.3d at 671; *In re J.P.B.*, 180 S.W.3d at 573.

Regarding the second factor, A.A.Z.2 had dental issues, for which he is now receiving treatment, and A.A.Z.1 requires glasses. Pena further said that A.A.Z.1 has had

---

[8] The following colloquy occurred during Cote's cross-examination:

| Q. [A.G.'s counsel] | Have the children ever expressed to you or have you ever asked the children if they want to go back to their parents? |
| A. [Cote] | Yes. I did talk to the two oldest who are more understanding of the situation and they don't. They tell me about the times where they wouldn't be able to wake up their parents when they were living there; they'd have to feed their baby sister. They have a lot of concerns. |
| Q. | Okay. Did they express to you that they do not ever want to go back to their parents? |
| A. | Um . . . |
| Q. | Did you ask them that? |
| A. | We never had that conversation about ever going back. |

11

recent behavior issues but is currently in therapy. Other than that, there was no evidence that the children have any emotional or physical needs beyond the substantial needs which are typical of children their age.

The evidence regarding the third factor centers mainly on A.G.'s persistent drug use. Cote said that A.G. did not consistently submit to random drug tests as required by the Department's service plan and the court's orders. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs."). A.G. agreed to undergo inpatient drug rehabilitation in August of 2020, but before she could attend, she had to be hospitalized for several days because she was suffering withdrawal symptoms in connection with an unprescribed medication. A.G. successfully completed the inpatient treatment, but when she was seen by a doctor on February 1, 2021, she appeared "over medicated" and "confused," and Cote said that this was generally consistent with her personal observations of A.G. throughout the case. Cote also testified A.G. appeared intoxicated at a visit with the children at the end of February, during which A.G. absented herself for forty-five minutes and claimed to be "preparing things for the kids" in her car. In early March of 2021, A.G. tested positive for methamphetamines; she stated she and J.G.L. did so because they "wanted to feel numb" after learning the Department intended to seek termination of their parental rights. Finally, as noted, A.G. does not dispute that the evidence was sufficient to support the trial court's finding, under § 161.001(b)(1)(P), that she continued to use drugs even "after completion of a court-ordered substance abuse treatment program." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(P). The trial court could have inferred from all of this evidence that A.G. presents a risk of emotional and physical

12

danger to the children. *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (reasoning that a parent's illegal drug use may support termination because "it exposes the child to the possibility that the parent may be impaired or imprisoned"); *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (noting that the fact-finder can give "great weight" to the "significant factor" of drug-related conduct by a parent).

As to the fourth and eighth factors, A.G. once approached the children outside their school, even though she was not supposed to have unsupervised contact with them. A.G. has completed a parenting class and counseling, but according to Cote, she has not "put the matters that [she has] been taught in those counseling sessions into practice." Cote said that, though the children seem to enjoy the visits with their parents, "[q]uite a few" of the visits have had "negative effect[s]" on the children because of appellants' tardiness and apparent intoxication. This evidence established that A.G. has subpar parenting abilities and that the relationship between her and the children is improper.

Regarding the sixth and seventh factors, the children were initially removed from appellants' care because they were found locked out of their "very dirty" apartment. A.G. did not have gainful employment outside the home at the time of trial, though she said she completed paperwork for a job at a convenience store. On the other hand, Cote stated the children are "doing very well" in their current placement with the Pena family. Pena testified that A.A.Z.1 has occasional behavior issues but A.A.Z.2 is "doing very good" in school.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest.

*In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d at 931; *see In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931. A.G.'s counsel emphasized at trial that, although the Department initially believed Pena would be willing to adopt all three children, Pena testified that she did not think she could "handle" A.A.Z.1 on a permanent basis because of her behavior issues. However, it is not necessary for the Department to establish "definitive plans for permanent placement and adoption" to show that termination is in the children's best interests. *See In re C.H.*, 89 S.W.3d at 28 ("Evidence about placement plans and adoption are, of course, relevant to best interest. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located.").

A.G. claims that "[v]irtually no direct evidence was provided at trial to support a finding that termination of A.G.'s parental rights was in the best interest of her children," but we disagree. Considering all the *Holley* factors, we conclude that the evidence was legally and factually sufficient to rebut the strong presumption that keeping the children with their biological mother is in their best interest. *See* TEX. FAM. CODE ANN. § 153.131. Instead, a reasonable trier of fact could have formed a firm belief or conviction that termination of A.G.'s parental rights was in the children's best interests, and the contrary evidence was not so significant as to preclude such a finding. *See In re J.L.*, 163 S.W.3d

14

79, 85 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 266.

A.G.'s second issue is overruled.

### III.    J.G.L.

#### A.    *Anders* Brief

J.G.L.'s court-appointed appellate counsel has filed a brief stating that he has diligently reviewed the entire record and has concluded that there are "no non-frivolous issues for appeal." *See Anders v. California*, 386 U.S. 738 (1967); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 56 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) ("[W]hen appointed counsel represents an indigent client in a parental termination appeal and concludes that there are no non-frivolous issues for appeal, counsel may file an *Anders*-type brief."). Counsel's brief meets the requirements of *Anders* as it presents a professional evaluation showing why there are no arguable grounds for advancing an appeal. *See In re Schulman*, 252 S.W.3d 403, 407 n.9 (Tex. Crim. App. 2008) (orig. proceeding) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities."). Counsel has informed this Court in writing that he has: (1) notified J.G.L. that he has filed an *Anders* brief and a motion to withdraw; (2) provided J.G.L. with copies of both pleadings; (3) informed J.G.L. of his rights to file a pro se response,[9] to review the record preparatory to filing that response, and to seek review if we conclude that the appeal is

---

[9] In the criminal context, the Texas Court of Criminal Appeals has held that "the pro se response need not comply with the rules of appellate procedure in order to be considered. Rather, the response should identify for the court those issues which the indigent appellant believes the court should consider in deciding whether the case presents any meritorious issues." *In re Schulman*, 252 S.W.3d 403, 409 n.23 (Tex. Crim. App. 2008).

frivolous; and (4) supplied J.G.L. with a form motion for pro se access to the appellate record. *See Anders*, 386 U.S. at 744. More than an adequate time has passed, and J.G.L. has not filed a pro se response.

## B.    Independent Review

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *see also In re G.M.*, No. 13-08-00569-CV, 2009 WL 2547493, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 20, 2009, no pet.) (mem. op.). We have reviewed the record and counsel's brief and we have found no reversible error with respect to J.G.L. *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005) ("Due to the nature of *Anders* briefs, by indicating in the opinion it considered the issues raised in the brief and reviewed the record for reversible error but found none, the court of appeals met the requirements of Texas Rule of Appellate Procedure 47.1.").

## C.    Motion to Withdraw

J.G.L.'s counsel has filed a motion to withdraw. *See Anders*, 386 U.S. at 744; *see also In re Schulman*, 252 S.W.3d at 408 n.17 ("If an attorney believes the appeal is frivolous, he must withdraw from representing the appellant."). However, when an *Anders* brief is filed in a parental termination appeal, the appellant's right to appointed counsel extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (citing TEX. FAM. CODE ANN. § 107.013(a)(1)). Thus, in the absence of additional grounds for withdrawal, a motion to withdraw brought in the court of appeals may be premature. *Id.* Counsel is permitted to withdraw only for good cause, and counsel's belief that the client has no grounds to seek further review from the court of appeals' decision does not constitute good cause.

16

*Id.*

J.G.L.'s counsel's motion to withdraw does not show "good cause" other than his determination that an appeal would be frivolous. Accordingly, we deny counsel's motion to withdraw. *See id.*; *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied) (denying a motion for withdrawal in light of *In re P.M.* where it did not show "good cause" other than counsel's determination that an appeal would be frivolous); *In re A.M.*, 495 S.W.3d 573, 582 & n.2 (Tex. App.—Houston [1st Dist.] 2016, pets. denied) (noting that since *In re P.M.* was handed down, "most courts of appeals affirming parental termination orders after receiving *Anders* briefs have denied the attorney's motion to withdraw").[10]

## IV.    CONCLUSION

The trial court's judgments of termination in both cause numbers are affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
10th day of November, 2021.

---

[10] The Texas Supreme Court has noted that, in cases such as this, "appointed counsel's obligations [in the supreme court] can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d 24, 28 (Tex. 2016).