

# NUMBER 13-22-00423-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.G., J.A., AND K.A., CHILDREN

On appeal from the County Court at Law No. 5
of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva
Memorandum Opinion by Chief Justice Contreras**

Appellant A.G. (Mother) challenges the trial court's judgment terminating her parental rights to minor children A.G., J.A., and K.A.[1] By a single issue, Mother contends that it was not in the children's best interest for her parental rights to be terminated. We affirm.

---

[1] To protect the identity of the children, we refer to them and their relatives by their initials. *See* TEX. R. APP. P. 9.8(b)(2).

# I. BACKGROUND

The children at issue in this case were born in 2014, 2018, and 2020. The Texas Department of Family and Protective Services (the Department) filed its petition to terminate Mother's parental rights on July 6, 2020.[2] At the time of the final hearing on September 15, 2022, the children were seven, three, and two years old, respectively.

At the final hearing, Department caseworker Kennedy Toungate testified that she was assigned to the case in January of 2022. According to her review of records, the Department first became involved with the family in October 2017, when it was revealed that M.A., K.A.'s biological father, "shot [A.G.] in the eye with a BB gun." A.G. was around three years old at the time. Despite this incident, Mother continued to be in a relationship with M.A. as of July 2020. Around that time, when K.A. was under five months old, he was admitted to Driscoll Children's Hospital with "17 fractures" around his body, including "[i]n his abdomen area, his legs, [and] his arms." At that point, K.A. was removed from his parents' custody, and both parents were eventually charged with crimes related to the child's injuries. As to Mother, a service plan was instituted which required her to undergo individual counseling, psychosocial and psychological assessments, parenting and domestic violence classes, and drug testing. The service plan also required Mother to allow the Department to access her home. Toungate testified that Mother completed her service plan "aside from being consistent with drug testing." In particular, Mother tested positive for cocaine "at the beginning of . . . this case" and later "became noncompliant"

---

[2] The petition also sought termination of the parental rights of the children's biological fathers. The final judgment in this case terminated the parental rights of J.G. to his biological daughter A.G.; it also terminated the rights of J.A.'s biological father, whose identity was not established. M.A. (K.A.'s biological father) later voluntarily relinquished his rights to K.A. in a separate proceeding. The fathers are not parties to this appeal.

by "refusing hair follicle[]" tests and "not being consistent" with urinalysis tests.

Toungate testified that Mother completed her parenting classes and demonstrated "some" behavior changes afterward.[3] However, the Department later discovered "hundreds" of "jail calls" between Mother and M.A. in which the two "discussed [that] once [the Department] was out of their lives, . . . they would be together and [Mother] would bring the children to see him, even if he was indicted for these charges." In the calls, Mother and M.A. discussed sexual matters and M.A. "basically said that he wanted to marry [Mother], just so she couldn't testify against him in a court of law." Based on these calls, Toungate opined that Mother intends to maintain her relationship with M.A. after he is released from incarceration, and that Mother therefore "lack[s] protective capacity" with respect to the children.[4] Toungate stated that she spoke with Mother "numerous times" about why it is not in the children's best interest for Mother to contact M.A.; nevertheless, Mother "continued to have these calls with him and continued to . . . promise [she would] allow him to see the children."

According to Toungate, K.A. is "doing well" in his current foster home placement, attending occupational therapy, and "interacting positively with the other children in the home and the foster parents." A.G. and J.A. were placed with their maternal grandparents and, as of the time of the final hearing, had been living with them for most of their lives. Toungate said that, if Mother's rights were terminated, the Department would like for the children to remain in their placements and be adopted by their current caregivers.

---

[3] The children's guardian ad litem testified that she attended a visit that Mother had with K.A., and that the visit "went very well." She stated: "There's no doubt that [Mother is] a good mother."

[4] Toungate defined "protective capacity" as "[t]o be able to keep the children safe in her care away from domestic violence, abuse, neglect, things of [that] nature." She noted that, at the time of the phone calls, there was a protective order in place prohibiting Mother from contacting M.A.

On cross-examination, Toungate stated that it has been "very difficult" for her to meet with Mother and she has been able to do so only once since taking over the case. Toungate acknowledged that Mother is employed as a cashier at Lowe's, is working on obtaining a degree to become a medical assistant, and returned a clean drug test on July 23, 2022. Toungate agreed that Mother told her she missed some drug tests because "she's at work or at school and is having trouble scheduling." She agreed that, whereas M.A. has an extensive criminal record—including charges for assault and terroristic threats—Mother has only one arrest on her record, for misdemeanor trespassing.

L.G., the children's maternal grandmother, testified that A.G. has lived with her since 2017 and J.A. since 2020. L.G. explained that M.A. "served 168 days" in confinement as a result of causing A.G.'s 2017 eye injury. She agreed that M.A. "has continued to be in [Mother's] life" since that time. She said that, though she and her husband "tried keeping [M.A.] away," he "keeps on coming back," and she found out in August 2021 that Mother was still "consistent[ly]" communicating with him. L.G. said she and her husband had been willing to supervise Mother's visitation with the children "until we found out [Mother] was talking to [M.A.]." She confirmed that she and her husband want to adopt A.G. and J.A., and she believed that it would be in their best interests for Mother's rights to be terminated in order for the adoption to occur. The children's appointed guardian ad litem also testified that termination of Mother's rights was in the best interests of all three children.

Mother testified that she was indicted on two counts of injury to a child with respect to the injuries suffered by K.A. in July 2022. Pursuant to a plea agreement, she pleaded no contest to the charges and was placed on deferred adjudication community

4

supervision for five years.[5] One of the conditions of her probation is that she have no contact with the children.

Mother stated that she has been living in a three-bedroom house for five months, and she opined that the house is adequate for the children. She said she continued to attend domestic violence counseling and parenting classes. She conceded that, for "a while," she was not truthful with the Department regarding her relationship with M.A. because she did not believe he was guilty of the things he was accused of. She admitted that she continued to communicate with M.A. even after promising the court she would not. Mother said she had been "under [M.A.'s] control" and that M.A. would promise her things in order to maintain the relationship. She conceded that the children's current caregivers met all of their basic needs.

With respect to Mother, the trial court found predicate grounds for termination by clear and convincing evidence under parts (D), (E), and (L) of Texas Family Code § 161.001(a)(1). *See* TEX. FAM. CODE ANN. § 161.001(a)(1)(D) (providing that parental rights may be terminated upon a predicate finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child"), (E) (same if the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child"), (L) (same if the parent has "been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child"). The court also found that termination of Mother's

---

[5] A copy of the "Order of Deferred Adjudication" was entered into evidence. It reflects that Mother pleaded "guilty" to two first-degree felony counts under penal code § 22.04(e). *See* TEX. PENAL CODE ANN. § 22.04(e) (stating that the offense of causing serious bodily injury to a child is a first-degree felony if committed intentionally or knowingly).

parental rights was in the best interests of the children. *See id.* § 161.001(a)(2). This appeal followed.

## II. DISCUSSION

Mother argues that "[i]t was not in the best interest of the children to terminate [her] parental rights," and she cites authority concerning factual sufficiency of the evidence. We therefore construe her issue as a challenge to the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the children's best interest.

### A. Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the

6

reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

When reviewing the factual sufficiency of the evidence supporting termination, we ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d at 26 ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Factors that courts consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the

child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all of these factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 27.

## B. Analysis

As to the first *Holley* factor, Mother points to a psychological evaluation of A.G. which states that, according to L.G., "[A.G.] loves her mother and would like to live with her full time, but she struggles to adjust to being in her mother's home for long amounts of time." The report also states that "[A.G.] does not have many memories of living with her mother, and whenever there are overnight visits with her biological mother, [A.G.] will eventually call and ask to come home before the visit is over." The psychological evaluation is contained in the clerk's record but was not formally offered into evidence at the final hearing.[6] There was no other evidence concerning the desires of the children,

---

[6] The Department suggests that we may not consider the evaluation in our analysis for this reason. *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.) (noting that "a court may take judicial notice that a pleading has been filed in the cause, or of the law of another jurisdiction," but it "may not . . . take judicial notice of the *truth* of allegations in its records"). We presume that the trial court took judicial notice of its file and we assume, but do not decide, that the psychological evaluation of A.G. was properly before the trial court. *See Marble Slab Creamery, Inc. v. Wesic, Inc.*, 823 S.W.2d 436, 439 (Tex. App.—Houston [14th Dist.] 1992, no writ) ("The trial court is entitled to take judicial notice of its own records where the same subject matter between the same parties is involved . . . . As the reviewing court,

two of which are too young to credibly express their desires. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (finding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires").

As to the second *Holley* factor, Toungate stated that K.A. requires occupational therapy. There was no other evidence that the children have any specific emotional or physical needs beyond those typical for their respective ages.

Relevant to the third *Holley* factor, regarding emotional and physical danger, is Toungate's testimony that Mother tested positive for cocaine at the beginning of the case. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that a parent's drug use supports a finding that termination is in the best interest of the child). Toungate also testified that Mother refused to undergo hair follicle testing and was not "consistent" with urinalysis testing, although she did not produce any further positive tests. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs.").

The Department's case for termination rested principally on the injuries suffered by A.G. and K.A. The record reflects that M.A. shot A.G. in the eye with a BB gun when she was around three years old, and K.A. suffered seventeen fractures around his body when he was under five months old. These injuries occurred when the children were in the exclusive care of Mother and M.A. Both parents were charged with crimes relating to

we may presume that the trial court took such judicial notice of the record without any request being made and without any announcement that it has done so."); *see also In re M.L.P.*, No. 13-20-00547-CV, 2022 WL 120012, at *7–9 (Tex. App.—Corpus Christi–Edinburg Jan. 13, 2022, no pet.) (mem. op.) (finding trial court did not err in considering written custody evaluation report, even though the report was not formally admitted as evidence at the final hearing, in part because appellant did not object to the court's consideration of the report).

9

K.A.'s injuries. Mother pleaded guilty to two first-degree felony counts of intentionally or knowingly causing injury to K.A.[7]

Importantly, the evidence reflected that Mother was either unable or unwilling to discontinue her relationship with M.A., even after she was ordered by the court to do so. Mother testified that, earlier in the case, she did not believe the accusations against M.A. and she was untruthful with the Department regarding her relationship with him. As described by Toungate, the numerous phone calls between M.A. and Mother established that the two are committed to each other and are likely to maintain their relationship in the future. The trial court could have determined from this evidence that, should Mother's rights not be terminated, the children would be in danger of physical harm now and in the future.

As to the sixth and seventh *Holley* factors, Toungate stated that Mother completed the programs required by her service plan aside from drug testing, but that she was difficult to contact throughout the case. Mother is gainfully employed and appears to have adequate housing, but at the time of the final hearing, Mother's probation conditions prohibited her from having contact with the children. On the other hand, the witnesses were unanimous that the children's current caregivers met their basic needs. L.G.— Mother's mother—testified that she is willing to adopt the two older children and agreed that termination of Mother's rights would be in their best interests so that this can occur. Toungate stated that K.A., the youngest child, is "doing well" in his current foster placement. The guardian ad litem opined that termination was in the best interests of all

_____

[7] As the Department points out, Mother does not dispute that the evidence was sufficient to support the trial court's predicate findings under parts (D) and (E) of family code § 161.001(a)(1), concerning endangerment.

10

three children.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *see In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). A factfinder may consider the consequences of failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur, rather than the impermanent foster-care arrangement that would result in the absence of termination. *See In re K.C.*, 219 S.W.3d at 931.

Considering all the *Holley* factors, we conclude that the evidence was factually sufficient to rebut the strong presumption that keeping the children with their biological mother is in their best interest. *See* TEX. FAM. CODE ANN. § 153.131. Instead, a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests, and the contrary evidence was not so significant as to preclude such a finding. *See In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005); *In re C.H.*, 89 S.W.3d at 25; *In re J.F.C.*, 96 S.W.3d at 266. We overrule Mother's issue on appeal.

### III.   CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
26th day of January, 2023.

11